Case 3:09-cv-00298-N   Document 1130   Filed 07/19/10   Page 1 of 15   Page 24  **FILED**

JUL 2 3 2010

IN THE UNITED STATES DISTRICT COURT   CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS   EASTERN DISTRICT OF CALIFORNIA
DALLAS DIVISION   BY _____ DEPUTY CLERK

SECURITIES AND EXCHANGE §
COMMISSION, §
§
§   10 MC 0076 GEB KJM
Plaintiff, §
§
v. §   Civil Action No. 3:09-CV-298-N
§
STANFORD INTERNATIONAL BANK, §
LTD., *et al.*, §
§
Defendant. §

## SECOND AMENDED ORDER APPOINTING RECEIVER

This Order addresses the S.E.C. and the Receiver's joint motion for entry of a second

amended order appointing receiver [958]. On February 17, 2009 this Court entered its order

appointing receiver [10]. On March 12, 2009 this Court entered its amended order

appointing receiver [157].

The Receiver's stated main purpose for seeking reentry of the order is to allow him

to comply with the requirements of 28 U.S.C. § 754,[1] which provides that a "receiver shall,

---

[1] The Receiver initially also proposed several substantive changes to the receivership order. Various parties objected to the Receiver's motion [986, 992, 995, 996, 1001, 1002]. In his reply, the Receiver abandoned all of his requested changes and simply asked the Court to reenter the order for Section 754 purposes. Accordingly, the Court overrules as moot all of the objections to the Receiver's proposed changes.

This second amended receivership order is identical to the first amended order, with several minor exceptions (removal of a provision that expired after 180 days, a clarification that the Receiver may not file for bankruptcy on behalf of individual defendants, and deletion of the term "relief defendant"). The Court entered the first amended order [157] more than one year ago. Accordingly, the Court finds that any objections to the substantive content of this order (other than objections to the proposed — now abandoned — revisions) have been

Certified a true copy of an instrument
on file in my office on JUL 2 1
Clerk, U.S. District Court,
Northern District of Texas
By _____ Deputy

ORDER – PAGE 1

within ten days after the entry of his order of appointment, file copies of the complaint and

such order of appointment in the district court for each district in which property is located."

The Receiver has informed the Court that after the expiration of 10 days from the dates of

the original receivership orders, he identified receivership assets and receivership records in

districts in which copies of the complaint and amended order appointing receiver have not

been filed. So that the Court may obtain jurisdiction in these districts, the Court now enters

this second amended order appointing receiver.[2]

IT IS THEREFORE ORDERED that:

   1. This Court assumes exclusive jurisdiction and takes possession of the assets,

monies, securities, properties, real and personal, tangible and intangible, of whatever kind

and description, wherever located, and the legally recognized privileges (with regard to the

entities), of the Defendants and all entities they own or control ("Receivership Assets"), and

---

waived.

  [2]Various courts have held that a district court may reset the ten-day Section 754 clock
by reentering the receivership order. *See, e.g., S.E.C. v. Vision Commc'ns, Inc.*, 74 F.3d 287,
291 (D.C. Cir. 1996) ("On remand, the court may reappoint the receiver and start the ten-day
clock of § 754 ticking once again."); *S.E.C. v. Aquacell Batteries, Inc.*, 2008 WL 2915064,
at *3 (M.D. Fla. 2008) ("[N]oncompliance with the statute can be 'cured' by subsequent
filing after re-appointment of the Receiver in any event . . . ."); *Warfield v. Arpe*, 2007 WL
549467, at *12 (N.D. Tex. 2007) ("Although the Fifth Circuit has not spoken on this
particular issue, other courts have held that a district court may reappoint a federal equity
receiver in a securities fraud case in order to 'reset' the 10-day clock under § 754."); *Terry
v. June*, 2003 WL 22125300, *3 (W.D. Va. 2003) ("[C]ourts having addressed this issue
unanimously suggest that an order of reappointment will renew the ten-day filing deadline
mandated by Section 754."); *SEC v. Heartland Group, Inc.*, 2003 WL 103015, at *5 (E.D.
Ill. 2003) ("[T]he court can easily correct this failure to file such a claim by merely
reappointing the Receiver and thereby starting the 10-day time period under § 754 ticking
once more.").

ORDER – PAGE 2

the books and records, client lists, account statements, financial and accounting documents, computers, computer hard drives, computer disks, internet exchange servers telephones, personal digital devices and other informational resources of or in possession of the Defendants, or issued by Defendants and in possession of any agent or employee of the Defendants ("Receivership Records").

2. Ralph S. Janvey of Dallas, Texas, is hereby appointed Receiver for the Receivership Assets and Receivership Records (collectively, "Receivership Estate"), with the full power of an equity receiver under common law as well as such powers as are enumerated herein as of the date of this Order. The Receiver shall not be required to post a bond unless directed by the Court but is hereby ordered to well and faithfully perform the duties of his office: to timely account for all monies, securities, and other properties which may come into his hands; and to abide by and perform all duties set forth in this Order. Except for an act of willful malfeasance or gross negligence, the Receiver shall not be liable for any loss or damage incurred by the Receivership Estate, or any of Defendants, the Defendants' clients or associates, or their subsidiaries or affiliates, their officers, directors, agents, and employees, or by any of Defendants' creditors or equity holders because of any' act performed or not performed by him or his agents or assigns in connection with the discharge of his duties and responsibilities hereunder.

3. The duties of the Receiver shall be specifically limited to matters relating to the Receivership Estate and unsettled claims thereof remaining in the possession of the Receiver as of the date of this Order. Nothing in this Order shall be construed to require

ORDER – PAGE 3

further investigation of Receivership Estate assets heretofore liquidated and/or distributed or claims of the Receivership Estate settled prior to issuance of this Order. However, this paragraph shall not be construed to limit the powers of the Receiver in any regard with respect to transactions that may have occurred prior to the date of this Order.

4. Until the expiration date of this Order or further Order of this Court, Receiver is authorized to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate.

5. As of the date of entry of this Order, the Receiver is specifically directed and authorized to perform the following acts and duties:

> (a) Maintain full control of the Receivership Estate with the power to retain or remove, as the Receiver deems necessary or advisable, any officer, director, independent contractor, employee or agent of the Receivership Estate;
>
> (b) Collect, marshal, and take custody, control, and possession of all the funds, accounts, mail, and other assets of, or in the possession or under the control of, the Receivership Estate, or assets traceable to assets owned or controlled by the Receivership Estate, wherever situated, the income and profit therefrom and all sums of money now or hereafter due or owing to the Receivership Estate with full power to collect, receive, and take possession of without limitation, all goods, chattel, rights, credits, monies, effects, lands, leases, books and records, work papers, records of account, including computer

ORDER – PAGE 4

maintained information, contracts, financial records, monies on hand in banks and other financial initiations, and other papers and documents of other individuals, partnerships, or corporations whose interests are now held by or under the direction, possession, custody, or control of the Receivership Estate; (c) Institute such actions or proceedings to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate. All such actions shall be filed in this Court;

(d) Obtain, by presentation of this Order, documents, books, records, accounts, deposits, testimony, or other information within the custody or control of any person or entity sufficient to identify accounts, properties, liabilities, causes of action, or employees of the Receivership Estate. The attendance of a person or entity for examination and/or production of documents may be compelled in a manner provided in Rule 45, Fed. R. Civ. P., or as provided under the laws of any foreign country where such documents, books, records, accounts, deposits, or testimony maybe located;

(e) Without breaching the peace and, if necessary, with the assistance of local peace officers or United States marshals to enter and secure any premises, wherever located or situated, in order to take possession, custody, or control of, or to identify the location or existence of Receivership Estate assets or records;

ORDER – PAGE 5

(f) Make such ordinary and necessary payments, distributions, and disbursements as the Receiver deems advisable or proper for the marshaling, maintenance, or preservation of the Receivership Estate. Receiver is further authorized to contract and negotiate with any claimants against the Receivership Estate (including, without limitation, creditors) for the purpose of compromising or settling any claim. To this purpose, in those instances in which Receivership Estate assets serve as collateral to secured creditors, the Receiver has the authority to surrender such assets to secured creditors, conditional upon the waiver of any deficiency of collateral;

(g) Perform all acts necessary to conserve, hold, manage, and preserve the value of the Receivership Estate, in order to prevent any irreparable loss, damage, and injury to the Estate;

(h) Enter into such agreements in connection with the administration of the Receivership Estate, including, but not limited to, the employment of such managers, agents, custodians, consultants, investigators, attorneys, and accountants as Receiver judges necessary to perform the duties set forth in this Order and to compensate them from the Receivership Assets;

(i) Institute, prosecute, compromise, adjust, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable to preserve the value of the Receivership Estate, or that the Receiver deems necessary and advisable to carry out the

ORDER – PAGE 6

Receiver's mandate under this Order and likewise to defend, compromise, or adjust or otherwise dispose of any or all actions or proceedings instituted against the Receivership Estate that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order;

(j) Preserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement thereof to claimants;

(k) Promptly provide the Commission and other governmental agencies with all information and documentation they may seek in connection with its regulatory or investigatory activities;

(l) Prepare and submit periodic reports to this Court and to the parties as directed by this Court;

(m) File with this Court requests for approval of reasonable fees to be paid to the Receiver and any person or entity retained by him and interim and final accountings for any reasonable expenses incurred and paid pursuant to order of this Court;

6. The Receiver shall have the sole and exclusive power and authority to manage and direct the business and financial affairs of the Defendants, including without limitation, the sole and exclusive power and authority to petition for relief under the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") for any or all of the corporate Defendants. The Receiver is not authorized, without further Court order, to petition for relief under the Bankruptcy Code for any of the Individual Defendants. Solely

ORDER – PAGE 7

with respect to the authorization to file and execution of a petition for relief under the Bankruptcy Code; without limiting any powers of the Receiver under applicable law and this Order; and irrespective of provisions in any Defendant's corporate organizing documents, by-laws, partnership agreements, or the like, the Receiver shall be deemed to succeed to the position of and possess the authority of any party with power to authorize and execute the filing of a petition for relief under the Bankruptcy Code, including without limitation corporate directors, general and limited partners, and members of limited liability companies.

7. Before taking action under paragraph 6 of this Order, the Receiver must provide the Commission and the Defendants with at least two business days' written notice (unless shortened or lengthened by court order) that the Receiver is contemplating action under the Bankruptcy Code; provided that the Receiver may apply for an order under seal or a hearing *in camera*, as circumstances require. To facilitate an efficient coordination in one district of all bankruptcies of the Defendants, the Northern District of Texas shall be the Receiver's principal place of business for making decisions in respect of operating and disposing of each of the Defendants and their respective assets.

8. Upon the request of the Receiver, the United States Marshal's Office is hereby ordered to assist the Receiver in carrying out his duties to take possession, custody, or control of, or identify the location of, any Receivership Estate assets or records.

9. Creditors and all other persons are hereby restrained and enjoined from the following actions, except in this Court, unless this Court, consistent with general equitable principals and in accordance with its ancillary equitable jurisdiction in this matter, orders that

ORDER -- PAGE 8

such actions may be conducted in another forum or jurisdiction:

> (a) The commencement or continuation, including the issuance or employment of process, of any judicial, administrative, or other proceeding against the Receiver, any of the defendants, the Receivership Estate, or any agent, officer, or employee related to the Receivership Estate, arising from the subject matter of this civil action; or

> (b) The enforcement, against the Receiver, or any of the defendants, of any judgment that would attach to or encumber the Receivership Estate that was obtained before the commencement of this proceeding.

10. Creditors and all other persons are hereby restrained and enjoined, without prior approval of the Court, from:

> (a) Any act to obtain possession of the Receivership Estate assets;

> (b) Any act to create, perfect, or enforce any lien against the property of the Receiver, or the Receivership Estate;

> (c) Any act to collect, assess, or recover a claim against the Receiver or that would attach to or encumber the Receivership Estate;

> (d) The set off of any debt owed by the Receivership Estate or secured by the Receivership Estate assets based on any claim against the Receiver or the Receivership Estate; or

> (e) The filing of any case, complaint, petition, or motion under the Bankruptcy Code (including, without limitation, the filing of an involuntary bankruptcy

ORDER – PAGE 9

petition under chapter 7 or chapter 11 of the Bankruptcy Code, or a petition for

recognition of foreign proceeding under chapter 15 of the Bankruptcy Code)

with respect to any Defendant.

11. Defendants, their respective officers, agents, and employees and all persons

in active concert or participation with them who receive notice of this Order by personal

service or otherwise, including, but not limited to, any financial institution, broker-dealer,

investment adviser, private equity fund or investment banking fun), and each of them, are

hereby ordered, restrained, and enjoined from, directly or indirectly, making any payment

or expenditure of any Receivership Estate assets that are owned by Defendants or in the

actual or constructive possession of any entity directly or indirectly owned or controlled or

under common control with the Receivership Estate, or effecting any sale, gift,

hypothecation, assignment, transfer, conveyance, encumbrance, disbursement, dissipation,

or concealment of such assets. A copy of this Order may be served on any bank, savings and

loan, broker-dealer, or any other financial or depository institution to restrain and enjoin any

such institution from disbursing any of the Receivership Estate assets. Upon presentment of

this Order, all persons, including financial institutions, shall provide account balance

information, transaction histories, all account records and any other Receivership Records

to the Receiver or his agents, in the same manner as they would be provided were the

Receiver the signatory on the account.

12. Defendants, and their respective agents, officers, and employees and all

persons in active concert or participation with them are hereby enjoined from doing any act

ORDER – PAGE 10

or thing whatsoever to interfere with the Receiver's taking control, possession, or management of the Receivership Estate or to in any way interfere with the Receiver or to harass or interfere with the duties of the Receiver or to interfere in any manner with the. exclusive jurisdiction of this Court over the Receivership Estate, including the filing or prosecuting any actions or proceedings which involve the Receiver or which affect the Receivership Assets or Receivership Records, specifically including any proceeding initiated pursuant to the United States Bankruptcy Code, except with the permission of this Court. Any actions so authorized to determine disputes relating to Receivership Assets and Receivership Records shall be filed in this Court.

13. Defendants, their respective officers, agents, and employees and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, including any financial institution, broker-dealer, investment adviser, private equity fund or investment banking firm, and each of them shall:

> (a) To the extent they have possession, custody, or control of same, provide immediate access to and control and possession of the Receivership Estate assets and records, including securities, monies, and property of any kind, real and personal, including all keys, passwords, entry codes, and all monies deposited in any bank deposited to the credit of the Defendants, wherever situated, and the original of all books, records, documents, accounts, computer printouts, disks, and the like of Defendants to Receiver or his duly authorized agents;

ORDER – PAGE 11

(b) Cooperate with the Receiver and his duly authorized agents by promptly and honestly responding to all requests for information regarding Receivership Assets and Records and by promptly acknowledging to third parties the Receiver's authority to act on behalf of the Receivership Estate and by providing such authorizations, signatures, releases, attestations, and access as the Receiver or his duly authorized agents may reasonably request;

(c) Provide the Commission with a prompt, full accounting of all Receivership Estate assets and documents outside the territory of the United States which are held either: (1) by them, (2) for their benefit, or (3) under their control;

(d) Transfer to the territory of the United States all Receivership Estate assets and records in foreign countries held either: (1) by them, (2) for their benefit, or (3) under their control; and

(e) Hold and retain all such repatriated Receivership Estate assets and documents and prevent any transfer, disposition, or dissipation whatsoever of any such assets or documents, until such time as they may be transferred into the possession of the Receiver.

14. Any financial institution, broker-dealer, investment adviser, private equity fund or investment banking firm or person that holds, controls, or maintains accounts or assets of or on behalf of any Defendant, or has held, controlled, or maintained any account or asset of or on behalf of any defendant since January 1, 1990, shall:

ORDER – PAGE 12

(a) Hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, hypothecation, encumbrance, disbursement, dissipation, conversion, sale, gift, or other disposal of any of the assets, funds, or other property held by or on behalf of any defendant in any account maintained in the name of or for the benefit of any defendant in whole or in part except:

(i) as directed by further order of this Court, or

(ii) as directed in writing by the Receiver or his agents;

(b) Deny access to any safe deposit boxes that are subject to access by any Defendant; and

(c) The Commission and Receiver may obtain, by presentation of this Order, documents, books, records, accounts, deposits, or other information within the custody or control of any person or entity sufficient to identify accounts, properties, liabilities, causes of action, or employees of the Receivership Estate. The attendance of a person or entity for examination and/or production of documents may be compelled in a manner provided in Rule 45, Fed. R. Civ. P, or as provided under the laws of any foreign country where such documents, books, records, accounts, deposits, or testimony may be located;

15. The Defendants, their officers, agents, and employees and all persons in active concert or participation with them and other persons who have notice of this Order by personal service or otherwise, are hereby restrained and enjoined from destroying, mutilating,

ORDER – PAGE 13

concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, any contracts, accounting data, correspondence, advertisements, computer tapes, disks or other computerized records, books, written or printed records, handwritten notes, telephone logs, telephone scripts, receipt books, ledgers, personal and business canceled checks and check registers, bank statements, appointment books, copies of federal, state, or local business or personal income or property tax returns, and other documents or records of any kind that relate in any way to the Receivership Estate or are relevant to this action.

16. The Receiver is hereby authorized to make appropriate notification to the United States Postal Service to forward delivery of any mail addressed to the Defendants, or any company or entity under the direction and control of the Defendants, to himself. Further, the Receiver is hereby authorized to open and inspect all such mail to determine the location or identity of assets or the existence and amount of claims.

17. Nothing in this Order shall prohibit any federal or state law enforcement or regulatory authority from commencing or prosecuting an action against the Defendants, their agents, officers, or employees.

ORDER – PAGE 14

Signed July 19, 2010.

David C. Godbey
United States District Judge

ORDER – PAGE 15

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | **SECOND AMENDED** |
| | § | **COMPLAINT** |
| v. | § | |
| | § | Case No.: 3:09-cv-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., | § | |
| STANFORD GROUP COMPANY, | § | |
| STANFORD CAPITAL MANAGEMENT, LLC, | § | |
| R. ALLEN STANFORD, JAMES M. DAVIS, | § | |
| LAURA PENDERGEST-HOLT, GILBERTO LOPEZ, | § | |
| MARK KUHRT AND LEROY KING | § | |
| | § | |
| Defendants, | § | |
| and | § | |
| | § | |
| STANFORD FINANCIAL GROUP COMPANY and | § | |
| THE STANFORD FINANCIAL GROUP BLDG INC., | § | |
| | § | |
| Relief Defendants. | § | |
| | § | |

Plaintiff Securities and Exchange Commission alleges:

## SUMMARY

1.  For at least a decade, R. Allen Stanford and James M. Davis executed a massive

Ponzi scheme through entities under their control, including Stanford International Bank, Ltd.

("SIB") and its affiliated Houston-based broker-dealers and investment advisers, Stanford Group

Company ("SGC") and Stanford Capital Management ("SCM"). Stanford and Davis, acting in

concert with the other defendants, misappropriated billions of dollars of investor funds and

falsified SIB's financial statements in an effort to conceal their fraudulent conduct.

2.  By year-end 2008, SIB had sold more than $7.2 billion of self-styled "certificates

of deposits" (the "CD") by touting: (i) the bank's safety and security; (ii) consistent, double-digit

Certified a true copy of an instrument
on file in my office on.
Clerk, U.S. District Court,
Northern District of Texas
By _____ Deputy

returns on the bank's investment portfolio; and (iii) high return rates on the CD that greatly
exceeded those offered by commercial banks in the United States.

     3.     Contrary to SIB's public statements, Stanford and Davis, by February 2009, had
misappropriated billions of dollars of investor money and "invested" an undetermined amount of
investor funds in speculative, unprofitable private businesses controlled by Stanford.

     4.     In an effort to conceal their fraudulent conduct and maintain the flow of investor
money into SIB's coffers, Stanford and Davis fabricated the performance of the bank's
investment portfolio and lied to investors about the nature and performance of the portfolio.
Gilberto Lopez and Mark Kuhrt, accountants for Stanford-affiliated companies, fabricated the
financial statements. Using a pre-determined return on investment number, typically provided
by Stanford or Davis, Lopez and Kuhrt reverse-engineered the bank's financial statements to
report investment income that the bank did not actually earn. Information in SIB's financial
statements and annual reports to investors about the bank's investment portfolio bore no
relationship to the actual performance of the bank investments. SIB's financial statements and
annual reports to investors were prepared, drafted and approved by Stanford, Davis, Lopez and
Kuhrt. Stanford and Davis signed these falsified financial statements.

     5.     Laura Pendergest-Holt, the chief investment officer of Stanford Financial Group
("SFG") and a member of SIB's investment committee, facilitated the fraudulent scheme by
misrepresenting to investors that she managed SIB's multi-billion investment portfolio of assets
and supervised a sizeable team of analysts to monitor the portfolio.

     6.     Leroy King, the administrator and chief executive officer of Antigua's Financial
Services Regulatory Commission (the "FSRC"), facilitated the Ponzi scheme by ensuring that
the FSRC "looked the other way" and conducted sham audits and examinations of SIB's books

and records. In exchange for bribes paid to him over a period of several years, King made sure that the FSRC did not examine SIB's investment portfolio. King also provided Stanford with access to the FSRC's confidential regulatory files, including requests by the Commission for assistance in investigating SIB as a possible Ponzi scheme. King further obstructed the Commission's investigation by allowing Stanford to dictate the substance, and even content, of the FSRC's responses to the Commission that relayed false assurances that there was no cause for concern as to SIB and by withholding information requested by the Commission that would have revealed Stanford's fraud.

7. In addition to sales of the CD, SGC and SCM advisers, since 2004, have sold more than $1 billion of a proprietary mutual fund wrap program, called Stanford Allocation Strategy ("SAS"), using materially false and misleading historical performance data. The false data enabled SGC/SCM to grow the SAS program from less than $10 million in 2004 to over $1.2 billion in 2009 and generate fees for SGC/SCM (and ultimately Stanford) in excess of $25 million. The fraudulent SAS performance results were also used to recruit registered financial advisers with significant books of business, who were then heavily incentivized to re-allocate their clients' assets to SIB's CD program.

8. By engaging in the conduct described in this Complaint, SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt directly or indirectly, singly or in concert, engaged, and unless enjoined and restrained, will again engage in transactions acts, practices, and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] or, in the alternative, aided and abetted such violations.     Likewise, through his

*SEC v. Stanford International Bank, Ltd., et al.*
*Second Amended Complaint*

3

actions, King aided and abetted, and unless enjoined and restrained, will continue to aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]. In addition, through conduct described herein, Stanford, SGC, and SCM violated Section 206(1) and (2) of the Investment Advisers Act of 1940 ("Adviser's Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], and Stanford, Davis, Pendergest-Holt, Lopez, Kuhrt, and King aided and abetted such violations. Finally, through their actions, SIB and SGC violated Section 7(d) of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. § 80a-7(d)].

## JURISDICTION AND VENUE

9.      The investments offered and sold by the Defendants are "securities" under Section 2(1) of the Securities Act [15 U.S.C. § 77b(1)], Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)], Section 2(36) of the Investment Company Act [15 U.S.C. § 80a-2(36)], and Section 202(18) of the Advisers Act [15 U.S.C. § 80b-2(18)].

10.     Plaintiff Commission brings this action under the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 41(d) of the Investment Company Act [15 U.S.C. § 80a-41(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)] to temporarily, preliminarily and permanently enjoin Defendants from future violations of the federal securities laws.

11.     This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 43 of the Investment Company Act [15 U.S.C. § 80a-43] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

12.     Defendants have, directly or indirectly, made use of the means or instruments of

*SEC v. Stanford International Bank, Ltd., et al.*                                    4
*Second Amended Complaint*

transportation and communication, and the means or instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices and courses of business alleged herein. Certain of the transactions, acts, practices and courses of business occurred in the Northern District of Texas.

## DEFENDANTS

13.     Stanford International Bank, Ltd. purports to be a private international bank domiciled in St. John's, Antigua, West Indies. SIB claims to serve 50,000 clients in over 100 countries, with assets of more than $7.2 billion. Unlike a commercial bank, SIB claims that it does not loan money. SIB sells the CD to U.S. investors through SGC, its affiliated investment adviser.

14.     Stanford Group Company, a Houston-based corporation, is registered with the Commission as a broker-dealer and investment adviser. It has 29 offices located throughout the United States. SGC's principal business consists of sales of SIB-issued securities, marketed as certificates of deposit. SGC is a wholly owned subsidiary of Stanford Group Holdings, Inc., which in turn is owned by R. Allen Stanford.

15.     Stanford Capital Management, a registered investment adviser, took over the management of the SAS program (formerly Mutual Fund Partners) from SGC in early 2007. SCM markets the SAS program through SGC.

16.     R. Allen Stanford, a citizen of the U.S. and Antigua and Barbuda, West Indies, is the chairman of the board and sole shareholder of SIB and the sole director of SGC's parent company. During the Commission's investigation, Stanford refused to produce documents and information accounting for the bank's multi-billion dollar investment portfolio.

17. James M. Davis, a U.S. citizen and resident of Baldwyn, Mississippi, is a director and the chief financial officer of SFG and SIB. Davis maintains offices in Memphis, Tennessee, and Tupelo, Mississippi. During the Commission's investigation, Davis refused to provide documents and information accounting for the bank's multi-billion dollar investment portfolio.

18. Laura Pendergest-Holt, is the chief investment officer of SFG and a resident of Baldwyn, Mississippi. She was appointed to SIB's investment committee on December 7, 2005. She supervises a group of analysts who "monitor" the performance of a small portion of SIB's portfolio.

19. Gilberto Lopez, a U.S. citizen and resident of Spring, Texas, worked in SFG's Houston, Texas, office, as the chief accounting officer of SFG and its affiliate, Stanford Financial Group Global Management, LLC ("SFGGM"). In this capacity, he provided accounting services to many entities under Stanford's control, including SIB, SFG and SFGGM. Lopez is not a CPA.

20. Mark Kuhrt, a U.S. citizen and resident of Christiansted, St. Croix, U.S. Virgin Islands, is the global controller for SFGGM. In this capacity, he provided accounting services to many entities under Stanford's control, including SIB, SFG, and SFGGM. Kuhrt reported at various times to Lopez and Davis, but also directly to Stanford. Kuhrt is not a CPA.

21. Leroy King, a citizen of the U.S. and of Antigua and Barbuda, West Indies, is the administrator and chief executive officer of Antigua's FSRC. Educated in the United States, he maintains residences in Antigua and in Atlanta, Georgia, where his wife lives. King has over 20 years of experience in the United States banking industry. King also serves on the board of directors of a U.S. registered broker-dealer and investment adviser based in Miami, Florida.

## RELIEF DEFENDANTS

22.    Stanford Financial Group Company, a Florida company owned and controlled by Stanford, holds certain assets, including real estate, on behalf of Stanford and his affiliated entities. SFG employees also provide accounting, legal, marketing and other services to many entities under Stanford's control, including SIB, SGC and SFGGM.

23.    The Stanford Financial Group Building Inc., a Texas corporation owned and controlled by Stanford, holds certain assets, including real estate, on behalf of Stanford and his affiliated entities.

## STATEMENT OF FACTS

### Stanford International Bank

24.    Stanford controls dozens of companies that operate under the name Stanford Financial Group. Stanford is the sole owner of SFG, SIB, SFGGM and dozens of other affiliated companies.

25.    SIB, one of SFG's affiliates, is a private, offshore bank located in Antigua.

26.    The primary product offered by SIB is a self-styled certificate of deposit. SIB sold more than $1 billion of the CD per year between 2005 and 2008, including sales to U.S. investors.

27.    SIB marketed the CD to investors in the United States exclusively through SGC advisers pursuant to a Regulation D private placement. In connection with the private placement, SIB filed several Forms D with the Commission.

28.    SIB paid disproportionately large commissions to SGC as compensation for the sale of the CD. SGC received a 3% trailing fee from SIB on sales of the CD by SGC advisers.

SGC advisers received a 1% commission upon the sale of the CD, and were eligible to receive as much as a 1% trailing commission throughout the term of the CD.

29.     SGC used this generous commission structure to recruit established financial advisers.  The commission structure also provided a powerful incentive for SGC financial advisers to aggressively sell CDs to investors.

30.     In 2007, SIB paid SGC and its affiliates more than $291 million in management fees and CD commissions, up from $211 million in 2006.

31.     SIB aggregated customer deposits, and then purportedly reinvested those funds in a "globally diversified portfolio" of assets.   As of November 28, 2008, SIB reported approximately $8.6 billion in total assets and an investment portfolio in excess of $8.4 billion.

32.     In selling the CD, SIB told investors that: (i) their assets were safe and secure because the bank invested in a "globally diversified portfolio" of "marketable securities;" (ii) the bank had averaged double-digits returns on its investments for over 15 years; (iii) Stanford had solidified SIB's capital position in late 2008 by infusing $541 million in capital into the bank; (iv) the bank's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of SFG analysts in Memphis, Tennessee; (v) the bank, in early 2009, was stronger than at any time in its history; and (vi) the bank did not have exposure to losses from investments in the Madoff fraud scheme.  These representations were false.

**SIB's Fraudulent Sale of CDs**

*Misappropriation of Investor Funds and Undisclosed Private-Equity Investments*

33.     In selling the CD to investors, SIB touted, among other things, the CD's safety, security and liquidity.

34.     In its CD marketing brochure, SIB told investors, under the heading "Depositor Security," that its investment philosophy is "anchored in time-proven conservative criteria, promoting stability in [the bank's] certificate of deposit." SIB also emphasized that its "prudent approach and methodology translate into deposit security for our customers" and the importance of investing in "marketable" securities, saying that "maintaining the highest degree of liquidity" was a "protective factor for our depositors."

35.     In its 2006 and 2007 Annual Reports, SIB told investors that the bank's assets were invested in a "well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements." More specifically, as seen below, SIB represented that its year-end 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments:



36.     Consistent with its Annual Reports and brochures, SIB trained SGC financial advisers, in February 2008, that the "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients."

37.     SIB's annual reports also represented that "SIB does not expose its clients to the risks associated with commercial loans . . . the Bank's only lending is on a cash secured basis."

38. Stanford and Davis approved and/or signed the Annual Reports, brochure and training materials.

39. Contrary to SIB's representations regarding the liquidity and safety of its portfolio, investors' funds were not invested in a "well-diversified portfolio of highly marketable securities." Instead, Stanford misappropriated a significant portion of the bank's investment portfolio. And SIB internal records reflect that more than half of the bank's investment portfolio was comprised of undisclosed "Private Equity Real Estate."

40. By year-end 2008, Stanford had misappropriated more than $1.6 billion from SIB. To conceal the theft, some of the transfers of CD investor money to Stanford were documented, after the fact, as personal "loans." Stanford's signature appears on at least $720 million in promissory notes to SIB that were recovered from his personal accountant's office, including promissory notes dated December 31, 1999, December 31, 2000, December 31, 2001, December 31, 2002 and December 31, 2003. Other "loans," particularly those in more recent years, were tracked in internal accounting records.

41. These promissory notes were typically created after Davis had, at Stanford's direction, wired out billions dollars of SIB investor funds to Stanford or his designees. Stanford used the money to, among other things, fund his "personal playground," including more than $400 million to fund personal real estate deals (e.g., The Sticky Wicket Restaurant) and more than $36 million to subsidize Stanford 20/20, an annual cricket tournament boasting a $20 million purse.

42. Lopez and Kuhrt (in addition to Stanford and Davis) were well aware of the more than $1.6 billion in "loans" to Stanford, tracking many of the transfers in a spreadsheet entitled "Shareholder Funding, Assumption of Debt and Notes Payable." Stanford made few, if any,

*SEC v. Stanford International Bank, Ltd., et al.*
*Second Amended Complaint*

10

payments required by the terms of the promissory notes. Instead, Stanford and Davis frequently rolled the outstanding loan balances and interest owed by Stanford to SIB into new, larger promissory notes.

43. Between February 2 and February 8, 2009, Stanford and Davis participated in meetings with a core group of senior executives in Miami, Florida for the purpose of preparing Pendergest-Holt and SIB's president for sworn testimony before the Commission staff. During these meetings, Stanford and Davis admitted that they had misappropriated investor funds by making these putative loans to Stanford.

44. During the Miami meetings, Davis and Pendergest-Holt collaborated on a presentation that included a pie chart detailing the allocation of assets in SIB's investment portfolio. The pie chart reflected, among other things, that SIB's investment portfolio was primarily comprised of (grossly over-valued) real estate (50.7%) and promissory notes payable by Stanford (29.47%).

45. Four days after the Miami meetings, Pendergest-Holt made a two-hour presentation to the Commission's staff – and subsequently testified under oath – regarding the whereabouts of SIB's multi-billion dollar investment portfolio. During her presentation and testimony, Pendergest-Holt denied any knowledge concerning the allocation of the vast majority of the bank's assets, despite knowing that more than 80% of SIB's investment portfolio was comprised of undisclosed personal "loans" to Stanford, undisclosed private equity and real estate deals.

46. The personal "loans" to Stanford were inconsistent with representations that had been made to investors. SIB's annual reports included a section entitled "Related-Party Transactions" that purported to disclose all related party transactions entered into by SIB. But

*SEC v. Stanford International Bank, Ltd., et al.*
*Second Amended Complaint*

11

SIB's "loans" to Stanford were not disclosed in that section of SIB's annual reports from 2004 through 2008, in its quarterly reports to the FSRC or anywhere else. Stanford, Davis, Lopez and Kuhrt, with full knowledge of the "loans" to Stanford, prepared, reviewed and authorized the filing and dissemination of these false and misleading annual reports.

47.     Contrary to the representations in the bank's annual reports that its "only form of lending is done on a cash-secured basis solely to existing clients," SIB exposed investors to the risks associated with more than $1.6 billion in unsecured personal "loans" to Stanford.

## *Falsification of Financial Statements*

48.     Stanford's misappropriation of investors' assets (and the poor performance of SIB's investment portfolio) created a giant hole in SIB's balance sheet. To conceal their fraudulent conduct and thereby ensure that investors continued to purchase CDs, Davis and Stanford, in concert with Lopez and Kuhrt, fabricated the growth, composition and performance of SIB's investment portfolio to give the appearance that the bank's investments were highly profitable.

49.     In its training materials for the SGC advisers, SIB represented that it earned consistent double-digit annual returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993) for almost fifteen years:



50.     SIB marketed the CD using these purported returns on investment.

51.     SIB claimed that its high returns on investment allowed it to offer significantly higher rates on the CD than those offered by U.S. banks. For example, SIB offered 7.45% as of June 1, 2005, and 7.878% as of March 20, 2006, for a fixed rate CD based on an investment of $100,000. On November 28, 2008, SIB quoted 5.375% on a 3-year flex CD, while U.S. bank CDs paid under 3.2%.

52.     In SIB's Annual Reports, SIB told investors that the bank earned from its "diversified" investments approximately $642 million in 2007 (11%), and $479 million in 2006 (12%).

53.     SIB's investment income included in its annual reports was fictional.   In calculating SIB's investment income, Stanford and Davis typically provided to SIB's internal accountants, including Lopez and Kuhrt, a predetermined return on investment for the bank's portfolio. Using this predetermined return, SIB's accountants, including Lopez and Kuhrt, reverse-engineered the bank's financial statements.     After they calculated the fictional investment income and asset growth and received Stanford and Davis' approval, Kuhrt and Lopez created and booked false accounting entries.

54.     Through their actions, Stanford, Davis, Lopez and Kuhrt caused SIB to report investment income that the bank did not actually earn and, thereby, greatly inflated the value of its investment portfolio. Specifically, Stanford, Davis, Lopez and Kuhrt prepared and reviewed SIB's financial statements, including the annual reports that were provided to investors and posted on the bank's website.

55. To hide the fabrication of SIB's double-digit annual returns on investment, Davis, Lopez and Kuhrt developed and implemented an elaborate and complex set of protocols for handling SIB financial information in which: (i) all SIB-related financial and other information was transferred to thumb drives and then deleted from servers located in the United States; (ii) back-up files were kept on a portable hard drive referred to as "the football;" (iii) paper SIB-related files were regularly flown to Antigua via Stanford's private jets, where they were burned; and (iv) electronic spreadsheets used to prepare the fraudulent financials were protected with passwords that were distributed via text message (to avoid detection on email servers).

56. Between February 2 and February 6, 2009, Stanford and Davis admitted, following a meeting with a core group of senior executives (including Pendergest-Holt) in Miami, Florida, that they had falsified SIB's financial statements.

### *Misrepresentation of Capital Infusions and Bogus Real Estate Transactions*

57. As world financial markets experienced substantial declines in 2008, it became apparent to Stanford and Davis that SIB could not credibly report investment profits in the 11% to 15% range (as it had done in previous years). Stanford and Davis agreed that SIB would for the first time show a "modest" loss to avoid raising too many red flags. In other words, they wanted to tell a "more believable lie."

58. Stanford and Davis knew that reporting a loss would cause SIB to fall below minimum regulatory capital requirements. Accordingly, Stanford informed Davis and other employees that he, in an effort to assure investors that SIB was financially sound, would contribute capital to the bank in two infusions of $200 million and $541 million. SIB touted the $541 million capital infusion to investors in a December 2008 report:

> Although our earnings will not meet expectations in 2008, Stanford International Bank Ltd. is strong, safe and fiscally sound. We have always believed that

depositor safety was our number one priority. To further support the Bank's
growth and provide a strong cushion for any further market volatility, the Bank's
Board of Directors made a decision to increase the Bank's capital by $541 million
on November 28, 2008. This contribution brings total shareholder equity to
$1,020,029,802 with a capital to assets ratio of 11.87% and a capital to deposits
ratio of 13.48%.

59.    Stanford, Davis and Pendergest-Holt approved the December 2008
Monthly Report.

60.    The purported capital infusions by Stanford were backdated, fictitious and
engineered to give the appearance that SIB had achieved "desired" levels of capital.

61.    Stanford, Davis, Lopez and Kuhrt considered two alternatives for disguising the
fictitious capital contributions.    First, Kuhrt and his subordinates proposed a massive
restructuring project in which Stanford would contribute personal holdings, including most of his
real estate and global banking interests, to SIB as "capital." When one of Kuhrt's subordinates
complained that the task could not be completed on the required timeline, and that the value of
the companies to be contributed to SIB would have to be impaired first because "none of them
had ever turned a profit," Stanford, Davis, Kuhrt and Lopez turned to another strategy.

62.    In December 2008, well after Stanford had purportedly infused the $200 million
and $541 million in additional capital into SIB, Stanford, Davis, Lopez and Kuhrt concocted
another scheme.    Stanford, Davis, Lopez and Kuhrt approved and implemented a scheme
whereby they "papered" a series of fraudulent round-trip real estate transactions utilizing
undeveloped Antiguan real estate acquired by SIB in 2008 for approximately $63.5 million (or
roughly $40,000 per acre).

63.    To give the appearance that the above-referenced capital infusions actually
occurred, Stanford, Davis, Kuhrt and Lopez falsified accounting records to give the appearance
that:

*SEC v. Stanford International Bank, Ltd., et al.*                                                    15
*Second Amended Complaint*

- SIB sold the Antiguan real estate to several newly-created Stanford-controlled entities at the original cost of $63.5 million (although there is no evidence that Stanford paid SIB the $63.5 million);

- the Stanford-controlled entities, at Stanford and Davis's instruction, immediately wrote-up the value of the real estate to approximately $3.2 billion dollars (or $2 million per acre), thereby exponentially increasing the value of the entities' stock;

- in an effort to satisfy a portion of Stanford's personal debt to SIB, Stanford contributed to SIB $1.7 billion of the fraudulently-inflated stock (using the inflated $2 million per acre valuation);

- Stanford then contributed to SIB additional stock in the real estate holding companies valued at $200 million and $541 million (again using the inflated $2 million per acre valuation) to fund the backdated capital contributions.

64.    These transactions did not infuse real capital into SIB. In fact, the entire process was fabricated *after* the reported capital contributions allegedly occurred. Moreover, the purported transactions do not validate the capital infusion claims because the inflation in value of the real estate from $40,000 to $2 million per acre was not justifiable under applicable U.S. or international accounting principles. SIB did not secure an appraisal and had no other reasonable support for such a drastic increase in value. And the transactions among Stanford-controlled entities were not the kind of arm's-length transactions required to justify a 5000% increase in value. Nevertheless, on a mere promise from Stanford that the land would appraise for over $3 billion, Stanford, Davis, Kuhrt and Lopez used $63.5 million of real estate to plug a multi-billion dollar hole in SIB's balance sheet and wipe-out a portion of Stanford's billions in debt owed to SIB.

*SEC v. Stanford International Bank, Ltd., et al.*                                                                 16
*Second Amended Complaint*

65.     Stanford, Davis, Kuhrt and Lopez, by virtue of their participation in the purported real estate transactions, knew that: (i) Stanford did not make a $541 million capital infusion into SIB; and (ii) the value of the real estate used to support the purported cash infusion was approximately $63.5 million, not $3.2 billion.

66.     Following Stanford, Davis, Lopez and Kuhrt's creation of the fraudulent capital infusions, the largest segment of the bank's investment portfolio would have been $3.2 billion in over-valued real estate. Yet, SIB did not disclose the transactions in its December 2008 newsletter, which touted Stanford's purported capital infusion. Moreover, Stanford's real estate investments were wholly inconsistent with SIB's representations to investors regarding SIB's investment portfolio (*i.e.*, marketable securities and no real estate).

### *Misrepresentations Regarding Management of SIB's Investment Portfolio*

67.     Prior to making investment decisions, prospective investors routinely asked how SIB safeguarded and monitored its assets. Investors frequently inquired whether Stanford could "run off with the money."

68.     In response to this question, at least during 2006 and much of 2007, Pendergest-Holt trained SIB's senior investment officer ("SIO") to tell investors that the bank's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of SFG analysts in Memphis, Tennessee. In communicating with investors, the SIO followed Pendergest-Holt's instructions, telling investors that SIB's entire investment portfolio was managed by a global network of money managers and monitored by a team of 20-plus analysts.

69.     Neither Pendergest-Holt nor the SIO disclosed to investors that SIB segregated its investment portfolio into three tiers: (i) cash and cash equivalents ("Tier 1"); (ii) investments

*SEC v. Stanford International Bank, Ltd., et al.*                                    17
*Second Amended Complaint*

with "outside portfolio managers (25+)" that were monitored by the SFG analysts ("Tier 2"); and (iii) undisclosed assets managed by Stanford and Davis ("Tier 3"). As of December 2008, Tier 1 represented approximately 9% ($800 million) of SIB's portfolio. Tier 2, prior to the bank's decision to liquidate $250 million of investments in late 2008, represented approximately 10% of the portfolio. And Tier 3 represented approximately 80% of SIB's investment portfolio.

70.     Neither Pendergest-Holt nor the SIO disclosed that the bank's Tier 3 assets were managed and/or monitored exclusively by Stanford and Davis. Likewise, they did not disclose that Stanford and Davis surrounded themselves with a close-knit circle of family, friends and confidants, thereby eliminating any independent oversight of SIB's assets.

71.     Neither Pendergest-Holt nor the SIO disclosed to investors that the "global network" of money managers and the team of analysts did not manage any of SIB's Tier 3 investments and, in reality, only monitored approximately 10% of SIB's portfolio. In fact, Pendergest-Holt trained the SIO "not to divulge too much" about the oversight of SIB's portfolio because that information "wouldn't leave an investor with a lot of confidence." Likewise, Davis instructed the SIO to "steer" potential CD investors away from information about SIB's portfolio.

### *Misrepresentation That SIB Was "Stronger" Than Ever Before*

72.     On January 10, 2009, Stanford, Davis and Pendergest-Holt spoke to SGC's Top Performer's Club (a collection of high performing Stanford financial advisers) in Miami, Florida.

73.     During the meeting, Davis stated that SIB was "stronger" than at any time in its history. Stanford, Davis and Pendergest-Holt represented that SIB was secure and built on a strong foundation, and that its financial condition was shored up by Stanford's capital infusions.

74.     But Davis failed to disclose that he had been informed only days earlier by the head of SIB's treasury that, despite SIB's best efforts to liquidate Tier 2 assets, SIB's cash position had fallen from the June 30, 2008 reported balance of $779 million to less than $28 million.

75.     Stanford and Davis failed to disclose to the SGC sales force that: (i) Stanford had misappropriated more than $1.6 billion of investor funds; (ii) SIB's annual reports, financial statements and quarterly reports to the FSRC were false; (iii) hundreds of millions of dollars of SIB investors' funds had been invested in a manner inconsistent with the bank's offering documents (*i.e.*, private equity and real estate); and (iv) the purported 2008 capital infusions by Stanford were a fiction.

76.     During her speech, Pendergest-Holt, after being introduced as SFG's chief investment officer and a "member of the investment committee of the bank," answered questions about SIB's investment portfolio. In so doing, she failed to disclose to attendees that she and her team of analysts did not manage SIB's entire investment portfolio and only monitored approximately 10% of the bank's investments. She also failed to disclose that SIB had invested investors' funds in a manner inconsistent with the bank's offering documents (*i.e.*, private equity and real estate).

77.     Stanford, Davis and Pendergest-Holt also failed to disclose that on or about December 12, 2008, Pershing, LLC, SGC's clearing broker-dealer, informed SGC that it would no longer process wire transfers from SGC to SIB for the purchase of the CD, citing suspicions about SIB's investment returns and its inability to get from the bank "a reasonable level of transparency" into its investment portfolio.

78.     Stanford, Davis and Pendergest knew that SGC advisers would use the information provided to them during the Top Performer's Club meeting to sell CDs.

### *Exposure to Losses From Madoff-related Investments*

79.     In the December 2008 Monthly Report, SIB told CD investors that the bank "had no direct or indirect exposure to any of [Bernard] Madoff's investments."

80.     Contrary to this statement, Stanford, Davis and Pendergest-Holt knew, prior to the release of the Monthly Report, that SIB had exposure to losses from investments with Madoff.

81.     On December 12, 2008, and again on December 18, 2008, Pendergest-Holt received e-mails from Meridian Capital Partners, a hedge fund with which SIB had invested, detailing SIB's exposure to Madoff-related losses.

82.     On December 15, 2008, an SFG-affiliated employee notified Pendergest-Holt and Davis that SIB had exposure to Madoff-related losses in two additional funds through which SIB had invested.   That same day, Davis, Pendergest-Holt and others consulted with Stanford regarding the bank's exposure to Madoff-related losses.

83.     Stanford, Davis and Pendergest-Holt never corrected this misrepresentation in the December 2008 monthly report.

### *Leroy King's Role in the Fraudulent Scheme*

84.     Leroy King was the administrator and chief executive officer of the FSRC, which is charged with the regulation and supervision of all offshore banks licensed in Antigua, including SIB.

85.     From at least February 2005, and continuing over a multi-year period, Stanford paid to King thousands of dollars in bribes, using money transferred from SIB to a Stanford-

controlled account at the Bank of Antigua, an onshore Antiguan bank owned and controlled by Stanford. King caused certain of these bribes to be deposited into U.S. bank accounts.

86.     In addition to the cash payments, Stanford gave to King and his wife significant non-cash benefits, including: (i) use of Stanford's fleet of private jets to travel throughout the United States and the Caribbean; (ii) use of an SIB corporate car; and (iii) 2004 Super Bowl tickets for King and a companion. Stanford subsequently hired King's Super Bowl companion as a human resources project manager in Houston.

87.     In exchange for the bribes, King facilitated SIB's fraud by obstructing the SEC's investigation into SIB and abdicating the FSRC's oversight responsibilities.

88.     On June 21, 2005, King, in response to an inquiry from the SEC, represented to the SEC staff that the FSRC had examined SIB and based on its examinations had concluded that "any further investigation of 'possible' fraudulent activities of [SIB] was unwarranted." King continued by saying that "it is the opinion of the FSRC that [SIB] has conducted its banking business to date in a manner the FSRC considers to be fully compliant." King had no basis for these representations. In exchange for the bribes from Stanford, King promised that the FSRC would not audit SIB's investment portfolio. In fact, on at least one occasion in or about May 2003, King removed from an examination of an SIB affiliate an inquisitive FSRC employee that "got too close to the fire."

89.     King also provided Stanford access to the FSRC's confidential regulatory files, including written requests by the Commission's staff for information regarding SIB. For example, on September 25, 2006, the Commission's staff faxed a letter to King requesting the FSRC's assistance with its investigation of SIB. That same day, Stanford, Davis, and SFG's

general counsel discussed the Commission letter and outlined for King precisely how they wanted him to respond to the Commission staff's request.

90.    On October 10, 2006, King did as Stanford instructed, sending a letter to the Commission's staff that tracked the response dictated by Stanford, Davis and SFG's general counsel. King's letter falsely stated: "We wish to assure the SEC that the FSRC's most recent onsite examination conducted just five months ago confirmed [SIB's] compliance with all areas of depositor safety and solvency, as well as all other applicable laws and regulations. The FSRC has further confirmed through its continuous visits and supervision of [SIB] that there are no other issues or matters of concern with [SIB.]" In fact, King knew there was no basis for this assurance.

91.    At or around the same time King was responding to the above-referenced inquires, Stanford and King, in concert with others, withheld information from the SEC, citing reliance on inapplicable bank secrecy laws in Antigua.

92.    During the same time period that King was accepting bribes from Stanford, the FSRC's website assured potential investors that the regulator conducted annual on-site examinations of all Antiguan offshore banks (like SIB) to determine their solvency, to review the quality of their investments and to verify the accuracy of their returns. The FSRC's website also told investors that it performed "continuous off-site supervision in the form of an analysis of quarterly returns and annual audited financial statements, with follow-up on prescribed corrective actions." King knew that these representations were false with regard to the FSRC's "oversight" of SIB.

93.    King, by virtue of the FSRC's review of SIB's market materials and annual reports, was also aware that SIB touted that the bank was subject to the FSRC's audits,

regulatory inspections, and licensing requirements. He knew that these representations were false. Moreover, SIB, SGC and SFG employees regularly told investors that their CDs were safe because of the FSRC's audits, misrepresentations that would have been publicly debunked but for King's misconduct.

## SGC and SCM's Fraudulent Mutual Fund Sales

94.     From 2004 through 2009, SGC and SCM induced clients, including non-accredited, retail investors, to invest in SAS, a proprietary mutual fund wrap program, by touting a fraudulent track record of "historical performance."

95.     SGC/SCM highlighted the purported SAS track record in thousands of client presentation books ("pitch books"). For example, the following chart from a 2006 pitch book presented clients with the false impression that SAS accounts, from 2000 through 2005, outperformed the S&P 500 by an average of approximately 13 percentage points:

|  | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|---|
| SAS Growth | 12.09% | 16.15% | 32.84% | -3.33% | 4.32% | 18.04% |
| S&P 500 | 4.91% | 10.88% | 28.68% | -22.10% | -11.88% | -9.11% |

96.     SGC/SCM used these performance results to grow the SAS program to over $1 billion in 2008.

97.     SGC/SCM also used the SAS track record to recruit financial advisers with significant books of business away from competitors. After arriving at Stanford, the newly-hired financial advisers were incentivized to put their clients' assets in the CD.

98. Other than the fees paid by SIB to SGC/SCM for CD sales, SAS was the most significant source of revenue for SGC/SCM. In 2007 and 2008, SGC/SCM received approximately $25 million in fees from the marketing of SAS.

99. The SAS performance results used in the 2005 through 2009 pitch books were fictional and/or inflated. SGC/SCM misrepresented that SAS performance results, for 1999 through 2004, reflected "historical performance" when, in fact, those results were fictional, or "back-tested," numbers that did not reflect the results of actual trading.

100. SGC/SCM, with the benefit of hindsight, picked mutual funds that performed extremely well from 1999 through 2004, and presented the performance of those top-performing funds to potential clients as if they were actual returns earned by the SAS program.

101. SGC/SCM also used "actual" model SAS performance results for 2005 and 2006 that were inflated by as much as 4 percentage points.

102. SGC/SCM told investors that SAS had positive returns for periods in which actual SAS clients lost substantial amounts. In 2000, actual SAS client returns ranged from negative 7.5% to positive 1.1%. In 2001, actual SAS client returns ranged from negative 10.7% to negative 2.1%. And, in 2002, actual SAS client returns ranged from negative 26.6% to negative 8.7%.

103. SGC/SCM's management knew that the advertised SAS performance results were misleading and inflated. And they also knew that the pre-2005 track record was purely hypothetical.

104. As early as November 2006, SGC/SCM investment advisers began to question why their clients were not receiving the returns advertised in the pitch books. In response to

*SEC v. Stanford International Bank, Ltd., et al.*
*Second Amended Complaint*

24

these questions, SGC/SCM hired an outside performance reporting expert to review the SAS performance results.

105.    In late 2006 and early 2007, the expert informed SGC/SCM that its performance results for the twelve months ended September 30, 2006 were inflated by as much as 3.4 percentage points.    Moreover, the expert informed SGC/SCM managers that the inflated performance results included unexplained "bad math" that consistently inflated the purported SAS performance results over actual client performance.    Finally, in March 2008, the expert informed SGC/SCM managers that the SAS performance results for 2005 were also inflated by as much as 3.25 percentage points.

106.    Despite its knowledge of the inflated SAS returns, SGC/SCM management continued using the pre-2005 track record and never asked the performance expert to audit the pre-2005 performance.    In fact, in 2008 pitch books, SGC/SCM presented the back-tested pre-2005 performance data under the heading "Historical Performance" and "Manager Performance" alongside the audited 2005 through 2008 figures.    SGC/SCM's outside consultant testified that it was "misleading" to present audited performance figures alongside back-tested figures.

107.    Finally, as indicated the chart below, SGC/SCM blended the back-tested performance with audited composite performance to create annualized 5 and 7 year performance figures that bore no relation to actual SAS client performance:

*SEC v. Stanford International Bank, Ltd., et al.*                                                    25
*Second Amended Complaint*

Calendar Year Return
As of March 2008

|  | YTD | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|
| SAS Growth | -7.44% | 12.40% | 14.68% | 8.62% | 16.15% | 32.84% | -3.33% | 4.32% | 18.04% | 22.59% |
| S&P 500 | -9.44% | 5.45% | 15.79% | 4.91% | 10.88% | 28.68% | -22.10% | -11.88% | -9.11% | 21.04% |

Annualized Returns
(not annualized if less than 1 year)

|  | YTD | 1 year | 3 years | 5 years | 7 years | Since inception |
|---|---|---|---|---|---|---|
| SAS Growth | -7.44% | 0.80% | 9.38% | 15.31% | 11.03% | 12.30% |
| S&P 500 | -9.44% | -6.08% | 5.85% | 11.32% | 3.70% | 2.45% |

108.    As evidence by its use of fictional and/or inflated performance results in the pitch

books, SGC/SCM knowingly misled investors in connection with the sale of SAS.

## CAUSES OF ACTION

### FIRST CLAIM
### AS TO
### SIB, SGC, SCM, STANFORD, DAVIS, PENDERGEST-HOLT, LOPEZ AND KUHRT
#### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

109.    Plaintiff Commission repeats and realleges paragraphs 1 through 108 above.

110.    SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt, directly or

indirectly, singly or in concert with others, in connection with the purchase and sale of securities,

by use of the means and instrumentalities of interstate commerce and by use of the mails have:

(i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material

facts and omitted to state material facts necessary in order to make the statements made, in light

of the circumstances under which they were made, not misleading; and (iii) engaged in acts,

practices and courses of business which operate as a fraud and deceit upon purchasers,

prospective purchasers and other persons.

111. As a part of and in furtherance of their scheme, SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt, directly and indirectly, prepared, disseminated or used contracts, written offering documents, financial statements, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

112. SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt made the referenced misrepresentations and omissions knowingly or with severe and gross recklessness.

113. For these reasons, SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM
### AS TO STANFORD, DAVIS, PENDERGEST-HOLT, LOPEZ, KUHRT AND KING
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5

114. Plaintiff Commission repeats and realleges paragraphs 1 through 108 above.

115. If Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt did not violate Exchange Act Section 10(b) and Rule 10b-5, in the alternative, each in the manner set forth above, knowingly or with severe recklessness provided substantial assistance in connection with the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] alleged herein. Likewise, King, in the manner set forth above, knowingly or with severe recklessness, provided substantial assistance in connection with the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] alleged herein.

116.    For these reasons, Stanford, Davis, Pendergest-Holt, Lopez, Kuhrt and King aided and abetted and, unless enjoined, will continue to aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

### THIRD CLAIM
### AS TO
### SIB, SGC, SCM, STANFORD, DAVIS, PENDERGEST-HOLT, LOPEZ AND KUHRT
#### Violations of Section 17(a) of the Securities Act

117.    Plaintiff Commission repeats and realleges paragraphs 1 through 108 above.

118.    SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, have: (i) employed devices, schemes or artifices to defraud; (ii) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit.

119.    As part of and in furtherance of this scheme, SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material fact and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

120.    SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt made the referenced misrepresentations and omissions knowingly or grossly recklessly disregarding the truth.

121.    For these reasons, SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and

Kuhrt have violated, and unless enjoined, will continue to violate Section 17(a) of the Securities

Act [15 U.S.C. § 77q(a)].

### FOURTH CLAIM
### AS TO STANFORD, SGC, AND STANFORD CAPITAL
#### Violations of Sections 206(1) and 206(2) of the Advisers Act

122.    Plaintiff Commission repeats and realleges paragraphs 1 through 108 above.

123.    Stanford, SGC and SCM, directly or indirectly, singly or in concert with others,

knowingly or recklessly, through the use of the mails or any means or instrumentality of

interstate commerce, while acting as investment advisers within the meaning of Section 202(11)

of the Advisers Act [15 U.S.C. § 80b-2(11)]: (i) have employed, are employing, or are about to

employ devices, schemes, and artifices to defraud any client or prospective client; or (ii) have

engaged, are engaging, or are about to engage in acts, practices, or courses of business which

operates as a fraud or deceit upon any client or prospective client.

124.    For these reasons, Stanford, SGC and SCM have violated, and unless enjoined,

will continue to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1)

and 80b-6(2)].

### FIFTH CLAIM
### AS TO STANFORD, DAVIS, PENDERGEST-HOLT, LOPEZ, KUHRT AND KING
#### Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act

125.    Plaintiff Commission repeats and realleges paragraphs 1 through 108 above.

126.    Based on the conduct alleged herein, Stanford, Davis, Pendergest-Holt, Lopez,

Kuhrt, and King, in the manner set forth above, knowingly or with severe recklessness provided

substantial assistance in connection with the violations of Advisers Act Sections 206(1) and

206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] alleged herein.

127. For these reasons, Stanford, Davis, Pendergest-Holt, Lopez, Kuhrt, and King aided and abetted and, unless enjoined, will continue to aid and abet violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## SIXTH CLAIM
## AS TO SIB AND SGC
### Violations of Section 7(d) of the Investment Company Act

128. Plaintiff Commission repeats and realleges paragraphs1 through 108 above.

129. SIB, an investment company not organized or otherwise created under the laws of the United States or of a State, directly or indirectly, singly or in concert with others, made use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to offer for sale, sell, or deliver after sale, in connection with a public offering, securities of which SIB was the issuer, without obtaining an order from the Commission permitting it to register as an investment company organized or otherwise created under the laws of a foreign country and to make a public offering of its securities by use of the mails and means or instrumentalities of interstate commerce.

130. SGC, directly or indirectly, singly or in concert with others, acted as an underwriter for SIB, an investment company not organized or otherwise created under the laws of the United States or of a State that made use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to offer for sale, sell, or deliver after sale, in connection with a public offering, securities of which SIB was the issuer, without obtaining an order from the Commission permitting it to register as an investment company organized or otherwise created under the laws of a foreign country and to make a public offering of its securities by use of the mails and means or instrumentalities of interstate commerce.

131.    For these reasons, SIB and SGC have violated, and unless enjoined, will continue

to violate Section 7(d) of the Investment Company Act [15 U.S.C. § 80a-7(d)].

## SEVENTH CLAIM
## AS TO RELIEF DEFENDANTS

132.    Plaintiff Commission repeats and realleges paragraphs1 through 108 above.

133.    Relief Defendants each were recipients, without consideration, of proceeds of the

fraudulent and illegal CD sales alleged herein. Each of these Relief Defendants profited from the

fraud by obtaining illegal proceeds under circumstances in which it is not just, equitable, or

conscionable for them to retain the illegal proceeds. Consequently, each of them has been named

as a Relief Defendant.

134.    Relief Defendants should disgorge their ill-gotten gains and any other property or

assets purchased with such gains.

## RELIEF REQUESTED

Plaintiff Commission respectfully requests that the Court:

### I.

Temporarily, preliminarily and permanently enjoin: (i) SIB, SGC, SCM, Stanford, Davis,

Pendergest-Holt, Lopez, Kuhrt, and King from violating, or aiding and abetting violations of,

Section 10(b) and Rule 10b-5 of the Exchange Act; (ii) SIB, SGC, SCM, Stanford, Davis,

Pendergest-Holt, Lopez and Kuhrt from violating Section 17(a) of the Securities Act; (iii) SGC,

SCM, Stanford, Davis, Pendergest-Holt, Lopez, Kuhrt and King from violating, or aiding and

abetting violations of, Sections 206(1) and 206(2) of the Advisers Act; and (iv) SIB and SCG

from violating Section 7(d) of the Investment Company Act.

II.

Order Defendants and Relief Defendants to disgorge an amount equal to the funds and benefits they obtained illegally as a result of the violations alleged herein, plus prejudgment interest on that amount.

III.

Order civil penalties against Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 41(e) of the Investment Company Act [15 U.S.C. § 80a-41(e)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] for their securities law violations.

IV.

Order such further relief as this Court may deem just and proper.

Dated January 8, 2010                    Respectfully submitted,

                                         *s/ David B. Reece*
                                         STEPHEN J. KOROTASH
                                         Oklahoma Bar No. 5102
                                         J. KEVIN EDMUNDSON
                                         Texas Bar No. 24044020
                                         DAVID B. REECE
                                         Texas Bar No. 24002810
                                         MICHAEL D. KING
                                         Texas Bar No. 24032634
                                         D. THOMAS KELTNER
                                         Texas Bar No. 24007474
                                         JASON ROSE
                                         Texas Bar No. 24007946

                                         U.S. Securities and Exchange Commission
                                         Burnett Plaza, Suite 1900
                                         801 Cherry Street, Unit #18
                                         Fort Worth, TX 76102-6882
                                         (817) 978-6476 (dbr)
                                         (817) 978-4927 (fax)

*SEC v. Stanford International Bank, Ltd., et al.*                    32
*Second Amended Complaint*

ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

MAR 1 2 2009

CLERK, U.S. DISTRICT COURT
By _____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No.: 3:09-cv-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., STANFORD GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, R. ALLEN STANFORD, JAMES M. DAVIS, and LAURA PENDERGEST-HOLT | § § § § § § § | |
| Defendants, | § § | |
| and | § § | |
| STANFORD FINANCIAL GROUP, and THE STANFORD FINANCIAL GROUP BLDG INC., | § § § | |
| Relief Defendants. | § § | |

**PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF
AS TO R. ALLEN STANFORD**

This matter came before me, the undersigned United States District Judge, this 12th day of March, 2009, on the application of Plaintiff Securities and Exchange Commission for issuance of a preliminary injunction against Defendant R. Allen Stanford and an order for other equitable relief against him. This Court has previously issued a temporary restraining order ("TRO"), order freezing assets, order requiring an accounting, order requiring preservation of documents, order authorizing expedited discovery, and order appointing receiver. The Court extended the TRO on March 2, 2009.

Based on the materials before the Court, the Court makes the following findings of fact and conclusions of law.

Certified a true copy of an instrument on file in my office on MAR - 4 2010. Clerk, U.S. District Court, Northern District of Texas By _____ Deputy

1.      Defendant Stanford received actual notice of the proceedings herein, and was validly served with a summons and complaint. In addition, Stanford was validly served and had actual notice of the TRO in this case and the March 2 extension of the TRO. Plaintiff noticed Stanford's deposition to take place on February 25, 2009.

2.      Stanford failed to appear for this deposition.

3.      Stanford was noticed for his deposition a second time on March 4, 2009. In lieu of appearing for his deposition testimony, Stanford provided the Commission with a declaration in which invoked his privilege against self incrimination under the Fifth Amendment to the United States Constitution.

4.      There are no factual issues in dispute with regard to Defendant Stanford. Despite having received service and notice of the proceedings, Stanford has not appeared or otherwise contested the entry of a preliminary injunction. Likewise, Stanford has not filed or served any papers in opposition to the entry of the preliminary injunction, or challenged the asset freeze or other emergency relief granted in the TRO.

5.      Defendant Stanford has failed to provide financial or account information as ordered by the Court.

6.      Defendant Stanford has failed to repatriate assets obtained from the activities alleged by the Commission.

7.      Stanford International Bank, Ltd. ("SIB") purports to be a private international bank domiciled in St. John's, Antigua, West Indies. SIB claims to serve 50,000 clients in over 100 countries, with assets under management of approximately $8 billion. SIB sells putative

*SEC v. Stanford International Bank, Ltd., et al.*
Preliminary Injunction and Order Granting Other Relief – R. Allen Stanford

2

certificates of deposit ("the CD") to U.S. investors through SGC, its affiliated investment
adviser.

8.      Stanford Group Company, a Houston-based corporation, is registered with the
Commission as a broker-dealer and investment adviser. It has 29 offices located throughout the
United States. SGC's principal business consists of sales of SIB-issued securities, marketed as
certificates of deposit. SGC is a wholly owned subsidiary of Stanford Group Holdings, Inc.,
which in turn is owned by Defendant Stanford.

9.      Stanford Capital Management, a registered investment adviser, took over the
management of the SAS program (formerly Mutual Fund Partners) from SGC in early 2007.
SCM markets the SAS program through SGC.

10.     Defendant Stanford, a citizen of the U.S. and Antigua, West Indies, is the
chairman of the board and sole shareholder of SIB and the sole director of SGC's parent
company.

11.     Stanford engaged in fraudulent conduct, including misappropriating investor
funds, and making material misrepresentations and omissions concerning, among other things,
SIB's certificate of deposit program, the nature and liquidity of SIB's assets, the existence of
related party transactions, purported loans from SIB to Stanford, purported capital infusions into
SIB, and the SAS program.

12.     Defendant Stanford's assets, including proceeds obtained through fraudulent
activities, are in imminent jeopardy of dissipation or loss. Absent an asset freeze, Defendant
Stanford can remove funds beyond the Court's jurisdiction with little hope that they can be
recovered at a later date, rendering any final judgment of disgorgement the Commission might
obtain meaningless.

13.     It is necessary to guard the records of Defendant Stanford relating to the

defendants or any of their securities, financial, or business dealings from destruction or

alteration.

14.     Defendant Stanford, directly and indirectly, has made use of the means and

instrumentalities of interstate commerce, the mails, or the facilities of a national securities exchange

in connection with the acts, practices, and courses of business described below and in the

Commission's pleadings.

15.     The Commission's action arises of out of conduct described herein that included

activities in the United States involving the sale of certain securities, including the CD sold by SIB

and other defendants and a propriety mutual fund wrap program known as "SAS."

16.     In selling the CD, the defendants in this action, including Defendant Stanford, made

representations concerning, among other things, (i) the bank's safety and security; and (ii)

consistent, double-digit returns on the bank's investment portfolio. These representations were

materially false and misleading. Instead, significant portions of the bank's portfolio were

misappropriated by Stanford used by him to acquire private equity and real estate. In fact, at

year-end 2008, the largest segments of the bank's portfolio were: (i) undocumented "loans" to

Stanford; (ii) private equity; and (iii) over-valued real estate.

17.     SIB's financial statements, which were approved by Defendant Stanford,

including its investment income, are also fictional. In calculating SIB's investment income,

Defendant Stanford provided to SIB's internal accountants a pre-determined return on

investment for the bank's portfolio. Using this pre-determined number, SIB's accountants

reverse-engineered the bank's financial statements to reflect investment income that SIB did not

actually earn.

*SEC v. Stanford International Bank, Ltd., et al.*                                                    4
Preliminary Injunction and Order Granting Other Relief – R. Allen Stanford

18.    In its December 2008 Monthly Report, which Stanford approved, SIB told investors that the bank had received a capital infusion of $541 million on November 28, 2008. This representation was materially false and misleading.

19.    The mutual fund wrap program referenced above was marketed based on materially false misleading historical performance data.

20.    The investments offered and sold by the Defendant are "securities" under Section 2(1) of the Securities Act [15 U.S.C. § 77b], Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c], Section 2(36) of the Investment Company Act [15 U.S.C. § 80a-2(36)], and Section 202(18) of the Advisers Act [15 U.S.C. § 80b-2(18)]

21.    This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 43 of the Investment Company Act [15 U.S.C. § 80a-43], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

22.    This Court has personal jurisdiction over Defendant Stanford based on the activities set forth above and those detailed in materials considered in this matter.

23.    Certain of the transactions, acts, practices, and courses of business constituting the alleged violations of law occurred within the Northern District of Texas.

24.    Defendant Stanford has been served with service of process and received actual notice of the pendency of this action against him, the TRO, the extension of the TRO, and the date and time of the preliminary injunction hearing in this matter. Service of process was validly effected. All pleadings and other papers necessary for the entry of this judgment were properly served on Defendant Stanford.

25.    Defendant Stanford has violated this Court's order requiring him to provide

information regarding his assets and the requirement that he repatriate any assets located abroad.

Defendant Stanford has also defaulted on the Commission's motion for a preliminary injunction

continuing the asset freeze and for an order granting other relief by failing to contest the arguments

and allegations raised by the Commission.

26.    The Commission has demonstrated that it is necessary to continue the injunctive

relief, asset freeze, and other relief during the pendency of this action to ensure that there are assets

to satisfy, at least in part, any final judgment that the Commission might obtain against Defendant

Stanford.

27.    The Commission has demonstrated the proper showing of a current violation of the

federal securities laws and a risk that these violations will recur. Accordingly, a preliminary

injunction and asset freeze are warranted in this case against Defendants, including Defendant

Stanford.

Based on the foregoing Findings of Fact and Conclusions of Law:

I.

IT IS HEREBY ORDERED that Defendant Stanford and his agents, servants, employees,

attorneys, and all other persons in active concert or participation with him who receive actual

notice of this Preliminary Injunction by personal service or otherwise are restrained and enjoined

from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], directly or indirectly, in

the offer or sale of any security by the use of any means or instruments of transportation or

communication in interstate commerce or by the use of the mails, by:

(1)    employing any device, scheme, or artifice to defraud; or

(2)     obtaining money or property by means of any untrue statement of material fact or
        any omission to state a material fact necessary in order to make the statement(s)
        made, in the light of the circumstances under which they were made, not misleading;
        or

(3)     engaging in any transaction, practice, or course of business which operates or would
        operate as a fraud or deceit upon the purchaser.

II.

IT IS HEREBY ORDERED that Defendant Stanford and his agents, servants, employees,
attorneys, and all other persons in active concert or participation with him who receive actual
notice of this Preliminary Injunction by personal service or otherwise are restrained and enjoined
from violating or aiding and abetting violations of Section 10(b) of the Exchange Act or Rule 10b-
5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5], directly or indirectly, in connection with the
purchase or sale of any security, by making use of any means or instrumentality of interstate
commerce, or of the mails, or of any facility of any national securities exchange:

(1)     to use or employ any manipulative or deceptive device or contrivance in
        contravention of the rules and regulations promulgated by the Commission;

(2)     to employ any device, scheme, or artifice to defraud;

(3)     to make any untrue statement of a material fact or omit to state a material fact
        necessary in order to make the statements made, in the light of the circumstances
        under which they were made, not misleading; or

(4)     to engage in any act, practice, or course of business which operates or would operate
        as a fraud or deceit upon any person.

III.

IT IS HEREBY ORDERED that Defendant Stanford and his agents, servants, employees, attorneys, and all other persons in active concert or participation with him who receive actual notice of this Preliminary Injunction by personal service or otherwise are restrained and enjoined from aiding and abetting violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)], directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, by:

    (1)    employing any device, scheme, or artifice to defraud any client or prospective client; or

    (2)    engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

IV.

IT IS HEREBY ORDERED that Defendant Stanford and his agents, servants, employees, attorneys, and all other persons in active concert or participation with him who receive actual notice of this Preliminary Injunction by personal service or otherwise are hereby restrained and enjoined from, directly or indirectly, making any payment or expenditure of funds belonging to or in the possession, custody, or control of Defendant Stanford, or effecting any sale, gift, hypothecation, or other disposition of any asset belonging to or in the possession, custody, or control of Defendant Stanford, pending a showing to this Court that Defendant Stanford has sufficient funds or assets to satisfy all claims arising out of the violations alleged in the Commission's Complaint or the posting of a bond or surety sufficient to assure payment of any such claim.

V.

IT IS HEREBY ORDERED that all banks, savings and loan associations, savings banks, trust companies, securities broker-dealers, commodities dealers, investment companies, other financial or depository institutions, and investment companies that hold one or more accounts in the name, on behalf or for the benefit of Defendant Stanford who receive actual notice of this Preliminary Injunction by personal service or otherwise are hereby restrained and enjoined, in regard to any such account, from engaging in any transaction in securities (except liquidating transactions necessary to comply with a court order) or any disbursement of funds or securities pending further order of this Court.

VI.

IT IS HEREBY ORDERED that all other individuals, corporations, partnerships, limited liability companies, and other artificial entities who receive actual notice of this Preliminary Injunction by personal service or otherwise are hereby restrained and enjoined from disbursing any funds, securities, or other property obtained from Defendant Stanford without adequate consideration.

VII.

IT IS HEREBY ORDERED that Defendant Stanford is hereby required to make an interim accounting, under oath, within ten days of the issuance of this order: (1) detailing all monies and other benefits which he received, directly or indirectly, as a result of the activities alleged in the Complaint (including the date on which the monies or other benefit was received and the name, address, and telephone number of the person paying the money or providing the benefit); (2) listing all current assets wherever they may be located and by whomever they are being held (including the name and address of the holder and the amount or value of the

holdings); and (3) listing all accounts with any financial or brokerage institution maintained in the name of, on behalf of, or for the benefit of, Defendant Stanford (including the name and address of the account holder and the account number) and the amount held in each account at any point during the period from January 1, 2000 through the date of the accounting.

## VIII.

IT IS HEREBY ORDERED that Defendant Stanford and his agents, servants, employees, attorneys, and all other persons in active concert or participation with them, including any bank, securities broker-dealer, or any financial or depositary institution, who receives actual notice of this Preliminary Injunction by personal service or otherwise are hereby restrained and enjoined from destroying, removing, mutilating, altering, concealing, or disposing of, in any manner, any books and records owned by, or pertaining to, the financial transactions and assets of Defendant or any entities under his control.

## IX.

IT IS HEREBY ORDERED that the Commission is authorized to serve process on, and give notice of these proceedings and the relief granted herein to, Defendant by U.S. Mail, e-mail, facsimile, or any other means authorized by the Federal Rules of Civil Procedure.

## X.

IT IS HEREBY ORDERED that expedited discovery may take place consistent with the following:

(1)     any party may notice and conduct depositions upon oral examination and may request and obtain production of documents or other things for inspection and copying from parties prior to the expiration of thirty days after service of a summons and the Plaintiff Commission's Complaint upon Defendant;

*SEC v. Stanford International Bank, Ltd., et al.*                                                               10
Preliminary Injunction and Order Granting Other Relief – R. Allen Stanford

(2)     all parties shall comply with the provisions of Fed. R. Civ. P. 45 regarding issuance and service of subpoenas, unless the person designated to provide testimony or to produce documents and things agrees to provide the testimony or to produce the documents or things without the issuance of a subpoena or to do so at a place other than one at which testimony or production can be compelled;

(3)     any party may notice and conduct depositions upon oral examination subject to minimum notice of seventy-two (72) hours;

(4)     all parties shall produce for inspection and copying all documents and things that are requested within seventy-two (72) hours of service of a written request for those documents and things; and

(5)     all parties shall serve written responses to written interrogatories within seventy-two (72) hours after service of the interrogatories.

## XI.

IT IS HEREBY ORDERED that all parties shall serve written responses to any other party's request for discovery and the interim accountings to be provided by Defendant by delivery to the Plaintiff Commission address as follows:

> UNITED STATES SECURITIES AND EXCHANGE COMMISSION
> Fort Worth Regional Office
> Attention: David Reece
> Burnett Plaza, Suite 1900
> 801 Cherry Street, Unit #18
> Fort Worth, TX 76102-6882
> Facsimile: (817) 978-4927

and by delivery to other parties at such address(es) as may be designated by them in writing. Such delivery shall be made by the most expeditious means available, including e-mail and facsimile.

XII.

IT IS HEREBY ORDERED that Defendant Stanford shall surrender his passport and is barred from traveling outside the United States until further order of this Court.

XIII.

IT IS HEREBY ORDERED that Defendant Stanford and his agents, servants, employees, attorneys, depositories, banks, and all other persons in active concert or participation with them who receive actual notice of this Preliminary Injunction by personal service or otherwise shall:

(1)     take such steps as are necessary to repatriate to the territory of the United States all funds and assets of investors described in the Commission's Complaint in this action which are held by him, or are under his direct or indirect control, jointly or singly, and deposit such funds into the Registry of the United States District Court, Northern District of Texas; and

(2)     provide the Commission and the Court a written description of the funds and assets so repatriated.

XIV.

Defendant Stanford shall have twenty (20) days from the date of this Preliminary Injunction in which to answer the Commission's First Amended Complaint.

EXECUTED at 3:30 o'clock am/pm CST this 12 day of March , 2009

DAVID C. GODBEY
UNITED STATES DISTRICT JUDGE

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

MAR – 2 2009

CLERK, U.S. DISTRICT COURT
By _____ Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § Case No.: 3:09-cv-0298-N |
| | § |
| STANFORD INTERNATIONAL BANK, LTD., | § |
| STANFORD GROUP COMPANY, | § |
| STANFORD CAPITAL MANAGEMENT, LLC, | § |
| R. ALLEN STANFORD, JAMES M. DAVIS, and | § |
| LAURA PENDERGEST-HOLT | § |
| | § |
| Defendants. | § |

**AGREED PRELIMINARY INJUNCTION AS TO STANFORD
INTERNATIONAL BANK, LTD., STANFORD GROUP COMPANY
AND STANFORD CAPITAL MANAGEMENT, LLC
AND AGREED ORDER GRANTING OTHER EQUITABLE RELIEF**

This matter came before me, the undersigned United States District Judge, this ___ day of _March_, 2009, on the application of Plaintiff Securities and Exchange Commission for issuance of a preliminary injunction against Defendants Stanford International Bank, Ltd., Stanford Group Company and Stanford Capital Management, LLC ("Entity Defendants"), and an order for other equitable relief against each of them. This Court has previously issued a temporary restraining order, order freezing assets, order requiring an accounting, order requiring preservation of documents, order authorizing expedited discovery, and order appointing receiver. Defendants have agreed to the entry of this Agreed Preliminary Injunction and Agreed Order Granting Other Equitable Relief ("Preliminary Injunction"), without admitting or denying the allegations contained in the Commission's Complaint; have agreed that this Court has jurisdiction over them and subject matter of this action; and have agreed to waive a hearing and the entry of findings of fact and conclusions of law.

Certified a true copy of an instrument
on file in my office on MAR – 4 2010
Clerk, U.S. District Court
Northern District of Texas
By _____ Deputy

I.

IT IS HEREBY ORDERED that the Entity Defendants and their agents, servants, employees, attorneys, and all other persons in active concert or participation with them who receive actual notice of this Preliminary Injunction by personal service or otherwise are restrained and enjoined from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], directly or indirectly, in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, by:

    (1)    employing any device, scheme, or artifice to defraud; or

    (2)    obtaining money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statement(s) made, in the light of the circumstances under which they were made, not misleading; or

    (3)    engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

II.

IT IS HEREBY ORDERED that the Entity Defendants and their agents, servants, employees, attorneys, and all other persons in active concert or participation with them who receive actual notice of this Preliminary Injunction by personal service or otherwise are restrained and enjoined from violating Section 10(b) of the Exchange Act or Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5], directly or indirectly, in connection with the purchase or sale of any security, by making use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange:

    (1)    to use or employ any manipulative or deceptive device or contrivance in

*SEC v. Stanford International Bank, Ltd., et al.*
Preliminary Injunction and Order Granting Other Relief

*2*

contravention of the rules and regulations promulgated by the Commission;

(2)     to employ any device, scheme, or artifice to defraud;

(3)     to make any untrue statement of a material fact or omit to state a material fact
        necessary in order to make the statement made, in the light of the circumstances
        under which they were made, not misleading, or

(4)     to engage in any act, practice, or course of business which operates or would operate
        as a fraud or deceit upon any person.

### III.

IT IS HEREBY ORDERED that Defendants Stanford Group Company and Stanford
Capital Management, LLC, their agents, servants, employees, attorneys, and all other persons in
active concert or participation with them who receive actual notice of this Preliminary Injunction
by personal service or otherwise are restrained and enjoined from violating Sections 206(1) and
206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)], directly or indirectly, by use of the mails
or any means or instrumentality of interstate commerce, by:

(1)     employing any device, scheme, or artifice to defraud any client or prospective
        client; or

(2)     engaging in any transaction, practice, or course of business which operates as a
        fraud or deceit upon any client or prospective client.

### IV.

IT IS HEREBY ORDERED that Stanford International Bank, Ltd., and Stanford
Group Company, their officers, directors, agents, servants, employees, attorneys, and all
other persons in active concert or participation with them, are restrained and enjoined
from violating Section 7(d) of the Investment Company Act [15 U.S.C. §80a-7(d)], directly

or indirectly, by use of the mails or any means or instrumentality of interstate commerce, by:

    (1)    acting as an investment company, not organized or otherwise created under the laws of the United States or of a State, and offering for sale, selling, or delivering after sale, in connection with a public offering, any security of which such company is the issuer; or

    (2)    acting as a depositor of, trustee of, or underwriter for such a company; unless

    (3)    the Commission, upon application by the investment company not organized or otherwise created under the laws of the United States or of a State, issues a conditional or unconditional order permitting such company to register and to make a public offering of its securities by use of the mails and means or instrumentalities of interstate commerce.

V.

IT IS HEREBY ORDERED that all banks, savings and loan associations, savings banks, trust companies, securities broker-dealers, commodities dealers, investment companies, other financial or depository institutions, and investment companies that hold one or more accounts in the name, on behalf or for the benefit of the Entity Defendants who receive actual notice of this Preliminary Injunction by personal service or otherwise are hereby restrained and enjoined, in regard to any such account, from engaging in any transaction in securities (except liquidating transactions necessary to comply with a court order) or any disbursement of funds or securities pending further order of this Court.

VI.

IT IS HEREBY ORDERED that all other individuals, corporations, partnerships, limited liability companies, and other artificial entities who receive actual notice of this Preliminary Injunction by personal service or otherwise are hereby restrained and enjoined from disbursing any funds, securities, or other property obtained from the Entity Defendants without adequate consideration.

VII.

IT IS HEREBY ORDERED that any employee of, attorney for, and all other persons in active concert or participation with the Entity Defendants, including any bank, securities broker-dealer, or any financial or depositary institution, who receives actual notice of this Preliminary Injunction by personal service or otherwise are hereby restrained and enjoined from destroying, removing, mutilating, altering, concealing, or disposing of, in any manner, any books and records owned by, or pertaining to, the financial transactions and assets of Defendants or any entities under their control.

VIII.

The Entity Defendants shall have sixty (60) days from the date of this Preliminary

Injunction in which to answer the Commission's Complaint.

EXECUTED AND ENTERED at 4:30 o'clock ~~am~~/pm CST this 2 day of

_March_ , 2009

_____
UNITED STATES DISTRICT JUDGE

Agreed to Form:

_s/ David B. Reece_
David B. Reece
Securities and Exchange Commission
801 Cherry Street, 19th Floor
Fort Worth, Texas 76102
(817) 978-6476
(817) 978-4927 _fax_
reeced@sec.gov
_Counsel for Plaintiff Securities and Exchange Commission_

_s/ Ralph R. Janvey_
Ralph R. Janvey
Krage & Janvy
2100 Ross Avenue, Suite 2600
Dallas, Texas 75201
rjanvey@kjllp.com
_Receiver for the Entity Defendants_

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No.: 3:09-cv-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., | § | |
| STANFORD GROUP COMPANY, | § | |
| STANFORD CAPITAL MANAGEMENT, LLC, | § | |
| R. ALLEN STANFORD, JAMES M. DAVIS, and | § | |
| LAURA PENDERGEST-HOLT | § | |
| | § | |
| Defendants, | § | |
| and | § | |
| | § | |
| STANFORD FINANCIAL GROUP, and | § | |
| THE STANFORD FINANCIAL GROUP BLDG INC., | § | |
| | § | |
| Relief Defendants. | § | |

**U.S. DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FILED**

MAR 1 2 2009

CLERK, U.S. DISTRICT COURT
By_____
Deputy

## PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF
## AS TO JAMES M. DAVIS

This matter came before me, the undersigned United States District Judge, this 12th day

of March, 2009, on the application of Plaintiff Securities and Exchange Commission for issuance

of a preliminary injunction against Defendant James M. Davis and an order for other equitable

relief against him. This Court has previously issued a temporary restraining order ("TRO"),

order freezing assets, order requiring an accounting, order requiring preservation of documents,

order authorizing expedited discovery, and order appointing receiver. The Court extended that

TRO on March 2, 2009.

Based on the materials before the Court, the Court makes the following findings of fact

and conclusions of law.

Certified a true copy of an instrument
on file in my office on MAR - 4 2010
Clerk, U.S. District Court,
Northern District of Texas,
By_____ Deputy

1.      Defendant Davis received actual notice of the proceedings herein, and was validly

served with a summons and complaint. In addition, Davis was validly served and had actual

notice of the TRO entered in this case and the March 2, 2009 extension of the TRO. Plaintiff

noticed Davis's deposition was to occur on February 23, 2009.

2.      Davis failed to appear for this deposition.

3.      In lieu of appearing for his deposition testimony, Davis provided the Commission

with a declaration in which invoked his privilege against self incrimination under the Fifth

Amendment to the United States Constitution.

4.      There are no factual issues in dispute with regard to Defendant Davis. Despite

having received service and notice of the proceedings, Davis has not appeared or otherwise

contested the entry of a preliminary injunction. Likewise, Davis has not filed or served any

papers in opposition to the entry of the preliminary injunction, or challenged the asset freeze or

other emergency relief granted in the TRO.

5.      Defendant Davis has failed to provide financial or account information as ordered

by the Court.

6.      Defendant Davis has failed to repatriate assets obtained from the activities alleged

by the Commission.

7.      Stanford International Bank, Ltd. ("SIB") purports to be a private international

bank domiciled in St. John's, Antigua, West Indies. SIB claims to serve 50,000 clients in over

100 countries, with assets under management of approximately $8 billion. SIB sells putative

certificates of deposit ("the CD") to U.S. investors through SGC, its affiliated investment

adviser.

8.      Stanford Group Company, a Houston-based corporation, is registered with the Commission as a broker-dealer and investment adviser. It has 29 offices located throughout the United States. SGC's principal business consists of sales of SIB-issued securities, marketed as certificates of deposit. SGC is a wholly owned subsidiary of Stanford Group Holdings, Inc., which in turn is owned by Defendant Stanford.

9.      Stanford Capital Management, a registered investment adviser, took over the management of the SAS program (formerly Mutual Fund Partners) from SGC in early 2007. SCM markets the SAS program through SGC.

10.     Defendant Davis, a U.S. citizen and resident of Baldwyn, Mississippi, is a director and chief financial officer of SFG and SIB. Davis maintains offices in Memphis, Tennessee, and Tupelo, Mississippi.

11.     Davis engaged in fraudulent conduct, including misappropriating investor funds, and making material misrepresentations and omissions concerning, among other things, SIB's certificate of deposit program, the nature and liquidity of SIB's assets, the existence of related party transactions, purported loans from SIB to Stanford, purported capital infusions into SIB, and the SAS program.

12.     Davis's assets, including proceeds obtained through his fraudulent activities, are in imminent jeopardy of dissipation or loss. Absent an asset freeze, Defendant Davis can remove funds beyond the Court's jurisdiction with little hope that they can be recovered at a later date, rendering any final judgment of disgorgement the Commission might obtain meaningless.

13.     It is necessary to guard the records of Defendant Davis relating to the defendants or any of their securities, financial, or business dealings from destruction or alteration.

14.    Defendant Davis, directly and indirectly, has made use of the means and instrumentalities of interstate commerce, the mails, or the facilities of a national securities exchange in connection with the acts, practices, and courses of business described below and in the Commission's pleadings.

15.    The Commission's action arises of out of conduct described herein that included activities in the United States involving the sale of certain securities, including the CD sold by SIB and other defendants and a propriety mutual fund wrap program known as "SAS."

16.    In selling the CD, the defendants in this action, including Defendant Davis, made representations concerning, among other things, (i) the bank's safety and security; and (ii) consistent, double-digit returns on the bank's investment portfolio. These representations were materially false and misleading. Instead, significant portions of the bank's portfolio were misappropriated by Stanford used by him to acquire private equity and real estate. In fact, at year-end 2008, the largest segments of the bank's portfolio were: (i) undocumented "loans" to Stanford; (ii) private equity; and (iii) over-valued real estate.

17.    SIB's financial statements, which were approved by Defendant Davis, including its investment income, are also fictional. In calculating SIB's investment income, Defendant Davis provided to SIB's internal accountants a pre-determined return on investment for the bank's portfolio. Using this pre-determined number, SIB's accountants reverse-engineered the bank's financial statements to reflect investment income that SIB did not actually earn.

18.    In its December 2008 Monthly Report, which Davis approved, SIB told investors that the bank had received a capital infusion of $541 million on November 28, 2008. This representation was materially false and misleading.

19.     The mutual fund wrap program referenced above was marketed based on
materially false misleading historical performance data.

20.     The investments offered and sold by the Defendant are "securities" under Section
2(1) of the Securities Act [15 U.S.C. § 77b], Section 3(a)(10) of the Exchange Act [15 U.S.C. §
78c], Section 2(36) of the Investment Company Act [15 U.S.C. § 80a-2(36)], and Section
202(18) of the Advisers Act [15 U.S.C. § 80b-2(18)]

21.     This Court has jurisdiction over this action, and venue is proper, under Section
22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. §
78aa], Section 43 of the Investment Company Act [15 U.S.C. §  80a-43], and Section 214 of the
Advisers Act [15 U.S.C. §  80b-14].

22.     This Court has personal jurisdiction over Defendant Davis based on the activities set
forth above and those detailed in materials considered in this matter.

23.     Certain of the transactions, acts, practices, and courses of business constituting the
alleged violations of law occurred within the Northern District of Texas.

24.     Defendant Davis has been served with service of process and received actual notice
of the pendency of this action against him, the TRO, the extension of the TRO, and the date and
time of the preliminary injunction hearing in this matter.  Service of process was validly effected.
All pleadings and other papers necessary for the entry of this judgment were properly served on
Defendant Davis.

25.     Defendant Davis has violated this Court's order requiring him to provide
information regarding his assets and the requirement that he repatriate any assets located abroad.
Defendant Davis has also defaulted on the Commission's motion for a preliminary injunction

continuing the asset freeze and for an order granting other relief by failing to contest the arguments and allegations raised by the Commission.

26.     The Commission has demonstrated that it is necessary to continue the injunctive relief, asset freeze, and other relief during the pendency of this action to ensure that there are assets to satisfy, at least in part, any final judgment that the Commission might obtain against Defendant Davis.

27.     The Commission has demonstrated the proper showing of a current violation of the federal securities laws and a risk that these violations will recur. Accordingly, a preliminary injunction and asset freeze are warranted in this case against Defendants, including Defendant Davis.

Based on the foregoing Findings of Fact and Conclusions of Law:

I.

IT IS HEREBY ORDERED that Defendant Davis and his agents, servants, employees, attorneys, and all other persons in active concert or participation with him who receive actual notice of this Preliminary Injunction by personal service or otherwise are restrained and enjoined from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], directly or indirectly, in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, by:

(1)     employing any device, scheme, or artifice to defraud; or

(2)     obtaining money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statement(s) made, in the light of the circumstances under which they were made, not misleading; or

*SEC v. Stanford International Bank, Ltd., et al.*                                              6
Preliminary Injunction and Order Granting Other Relief – James M. Davis

(3)     engaging in any transaction, practice, or course of business which operates or would
        operate as a fraud or deceit upon the purchaser.

## II.

IT IS HEREBY ORDERED that Defendant Davis and his agents, servants, employees,
attorneys, and all other persons in active concert or participation with him who receive actual
notice of this Preliminary Injunction by personal service or otherwise are restrained and enjoined
from violating or aiding and abetting violations of Section 10(b) of the Exchange Act or Rule 10b-
5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5], directly or indirectly, in connection with the
purchase or sale of any security, by making use of any means or instrumentality of interstate
commerce, or of the mails, or of any facility of any national securities exchange:

(1)     to use or employ any manipulative or deceptive device or contrivance in
        contravention of the rules and regulations promulgated by the Commission;

(2)     to employ any device, scheme, or artifice to defraud;

(3)     to make any untrue statement of a material fact or omit to state a material fact
        necessary in order to make the statements made, in the light of the circumstances
        under which they were made, not misleading; or

(4)     to engage in any act, practice, or course of business which operates or would operate
        as a fraud or deceit upon any person.

## III.

IT IS HEREBY ORDERED that Defendant Davis and his agents, servants, employees,
attorneys, and all other persons in active concert or participation with him who receive actual
notice of this Preliminary Injunction by personal service or otherwise are restrained and enjoined

from aiding and abetting violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)], directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, by:

(1)     employing any device, scheme, or artifice to defraud any client or prospective client; or

(2)     engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

### IV.

IT IS HEREBY ORDERED that Defendant Davis and his agents, servants, employees, attorneys, and all other persons in active concert or participation with him who receive actual notice of this Preliminary Injunction by personal service or otherwise are hereby restrained and enjoined from, directly or indirectly, making any payment or expenditure of funds belonging to or in the possession, custody, or control of Defendant Davis, or effecting any sale, gift, hypothecation, or other disposition of any asset belonging to or in the possession, custody, or control of Defendant Davis, pending a showing to this Court that Defendant Davis has sufficient funds or assets to satisfy all claims arising out of the violations alleged in the Commission's Complaint or the posting of a bond or surety sufficient to assure payment of any such claim.

### V.

IT IS HEREBY ORDERED that all banks, savings and loan associations, savings banks, trust companies, securities broker-dealers, commodities dealers, investment companies, other financial or depository institutions, and investment companies that hold one or more accounts in the name, on behalf or for the benefit of Defendant Davis who receive actual notice of this Preliminary Injunction by personal service or otherwise are hereby restrained and enjoined, in

regard to any such account, from engaging in any transaction in securities (except liquidating transactions necessary to comply with a court order) or any disbursement of funds or securities pending further order of this Court.

VI.

IT IS HEREBY ORDERED that all other individuals, corporations, partnerships, limited liability companies, and other artificial entities who receive actual notice of this Preliminary Injunction by personal service or otherwise are hereby restrained and enjoined from disbursing any funds, securities, or other property obtained from Defendant Davis without adequate consideration.

VII.

IT IS HEREBY ORDERED that Defendant Davis is hereby required to make an interim accounting, under oath, within ten days of the issuance of this order: (1) detailing all monies and other benefits which he received, directly or indirectly, as a result of the activities alleged in the Complaint (including the date on which the monies or other benefit was received and the name, address, and telephone number of the person paying the money or providing the benefit); (2) listing all current assets wherever they may be located and by whomever they are being held (including the name and address of the holder and the amount or value of the holdings); and (3) listing all accounts with any financial or brokerage institution maintained in the name of, on behalf of, or for the benefit of, Defendant Davis (including the name and address of the account holder and the account number) and the amount held in each account at any point during the period from January 1, 2000 through the date of the accounting.

VIII.

IT IS HEREBY ORDERED that Defendant Davis and his agents, servants, employees, attorneys, and all other persons in active concert or participation with them, including any bank, securities broker-dealer, or any financial or depositary institution, who receives actual notice of this Preliminary Injunction by personal service or otherwise are hereby restrained and enjoined from destroying, removing, mutilating, altering, concealing, or disposing of, in any manner, any books and records owned by, or pertaining to, the financial transactions and assets of Defendant or any entities under his control.

### IX.

IT IS HEREBY ORDERED that the Commission is authorized to serve process on, and give notice of these proceedings and the relief granted herein to, Defendant by U.S. Mail, e-mail, facsimile, or any other means authorized by the Federal Rules of Civil Procedure.

### X.

IT IS HEREBY ORDERED that expedited discovery may take place consistent with the following:

(1)    any party may notice and conduct depositions upon oral examination and may request and obtain production of documents or other things for inspection and copying from parties prior to the expiration of thirty days after service of a summons and the Plaintiff Commission's Complaint upon Defendant;

(2)    all parties shall comply with the provisions of Fed. R. Civ. P. 45 regarding issuance and service of subpoenas, unless the person designated to provide testimony or to produce documents and things agrees to provide the testimony or to produce the documents or things without the issuance of a subpoena or to do so at a place other than one at which testimony or production can be compelled;

(3)     any party may notice and conduct depositions upon oral examination subject to

minimum notice of seventy-two (72) hours;

(4)     all parties shall produce for inspection and copying all documents and things that

are requested within seventy-two (72) hours of service of a written request for

those documents and things; and

(5)     all parties shall serve written responses to written interrogatories within seventy-

two (72) hours after service of the interrogatories.

## XI.

IT IS HEREBY ORDERED that all parties shall serve written responses to any other

party's request for discovery and the interim accountings to be provided by Defendant by

delivery to the Plaintiff Commission address as follows:

> UNITED STATES SECURITIES AND EXCHANGE COMMISSION
> Fort Worth Regional Office
> Attention: David Reece
> Burnett Plaza, Suite 1900
> 801 Cherry Street, Unit #18
> Fort Worth, TX 76102-6882
> Facsimile: (817) 978-4927

and by delivery to other parties at such address(es) as may be designated by them in writing.

Such delivery shall be made by the most expeditious means available, including e-mail and

facsimile.

## XII.

IT IS HEREBY ORDERED that Defendant Davis shall surrender his passport and is

barred from traveling outside the United States until further order of this Court.

## XIII.

*SEC v. Stanford International Bank, Ltd., et al.*                                                    11
Preliminary Injunction and Order Granting Other Relief – James M. Davis

IT IS HEREBY ORDERED that Defendant Davis and his agents, servants, employees, attorneys, depositories, banks, and all other persons in active concert or participation with them who receive actual notice of this Preliminary Injunction by personal service or otherwise shall:

(1)     take such steps as are necessary to repatriate to the territory of the United States all funds and assets of investors described in the Commission's Complaint in this action which are held by him, or are under his direct or indirect control, jointly or singly, and deposit such funds into the Registry of the United States District Court, Northern District of Texas; and

(2)     provide the Commission and the Court a written description of the funds and assets so repatriated.

XIV.

Defendant Davis shall have twenty (20) days from the date of this Preliminary Injunction in which to answer the Commission's First Amended Complaint.

EXECUTED at 3:30 o'clock am/pm CST this 12 day of March, 2009

DAVID C. GODBEY
UNITED STATES DISTRICT JUDGE

*SEC v. Stanford International Bank, Ltd., et al.*
Preliminary Injunction and Order Granting Other Relief – James M. Davis

12

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

MAR _ 2 2009

CLERK, U.S. DISTRICT COURT
By _____
            Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No.: 3:09-cv-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., | § | |
| STANFORD GROUP COMPANY, | § | |
| STANFORD CAPITAL MANAGEMENT, LLC, | § | |
| R. ALLEN STANFORD, JAMES M. DAVIS, and | § | |
| LAURA PENDERGEST-HOLT | § | |
| | § | |
| Defendants. | § | |

## AGREED PRELIMINARY INJUNCTION AS TO LAURA PENDERGEST-HOLT, AND AGREED ORDER GRANTING OTHER EQUITABLE RELIEF

This matter came before me, the undersigned United States District Judge, this ___ day of _____, 2009, on the application of Plaintiff Securities and Exchange Commission for issuance of a preliminary injunction against Defendant Laura Pendergest-Holt, and an order for other equitable relief against Defendant Pendergest-Holt. This Court has previously issued a temporary restraining order, order freezing assets, order requiring an accounting, order requiring preservation of documents, order authorizing expedited discovery, and order appointing receiver. Defendant Pendergest-Holt has agreed to the entry of this Agreed Preliminary Injunction and Agreed Order Granting Other Equitable Relief ("Preliminary Injunction"), without admitting or denying the allegations contained in the Commission's Complaint; has agreed that this Court has jurisdiction over her and subject matter of this action; and has agreed to waive a hearing and the entry of findings of fact and conclusions of law.

Certified a true copy of an instrument
on file in my office on ___ - 4 2010
Clerk, U.S. District Court,
Northern District of Texas
By _____ Deputy

I.

IT IS HEREBY ORDERED that Defendant Pendergest-Holt and her agents, servants, employees, attorneys, and all other persons in active concert or participation with them who receive actual notice of this Preliminary Injunction by personal service or otherwise are restrained and enjoined from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], directly or indirectly, in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, by:

    (1)    employing any device, scheme, or artifice to defraud; or

    (2)    obtaining money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statement(s) made, in the light of the circumstances under which they were made, not misleading; or

    (3)    engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

II.

IT IS HEREBY ORDERED that Defendant Pendergest-Holt and her agents, servants, employees, attorneys, and all other persons in active concert or participation with them who receive actual notice of this Preliminary Injunction by personal service or otherwise are restrained and enjoined from violating Section 10(b) of the Exchange Act or Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5], directly or indirectly, in connection with the purchase or sale of any security, by making use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange:

    (1)    to use or employ any manipulative or deceptive device or contrivance in contravention of the rules and regulations promulgated by the Commission;

(2)     to employ any device, scheme, or artifice to defraud;

(3)     to necessary imtomicstatement tfeastatemadtfantadepinithe light aftitstorintifacttances under which they were made, not misleading; or

(4)     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

III.

IT IS HEREBY ORDERED that Defendant Pendergest-Holt and her agents, servants, employees, attorneys, and all other persons in active concert or participation with them who receive actual notice of this Preliminary Injunction by personal service or otherwise are restrained and enjoined from violating Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)], directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, by:

(1)     employing any device, scheme, or artifice to defraud any client or prospective client; or

(2)     engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

IV.

IT IS HEREBY ORDERED that Defendant Pendergest-Holt and her agents, servants, employees, attorneys, and all other persons in active concert or participation with them who receive actual notice of this Preliminary Injunction by personal service or otherwise are hereby restrained and enjoined from, directly or indirectly, making any payment or expenditure of funds belonging to or in the possession, custody, or control of Defendant Pendergest-Holt, or effecting any sale, gift, hypothecation, or other disposition of any asset belonging to or in the possession, custody,

or control of Defendant Pendergest-Holt, pending a showing to this Court that Defendant Pendergest-Holt has sufficient funds or assets to satisfy all claims arising out of the violations alleged in the Commission's Complaint or the posting of a bond or surety sufficient to assure payment of any such claim.

V.

IT IS HEREBY ORDERED that all banks, savings and loan associations, savings banks, trust companies, securities broker-dealers, commodities dealers, investment companies, other financial or depository institutions, and investment companies that hold one or more accounts in the name, on behalf or for the benefit of Defendant Pendergest-Holt who receive actual notice of this Preliminary Injunction by personal service or otherwise are hereby restrained and enjoined, in regard to any such account, from engaging in any transaction in securities (except liquidating transactions necessary to comply with a court order) or any disbursement of funds or securities pending further order of this Court.

VI.

IT IS HEREBY ORDERED that all other individuals, corporations, partnerships, limited liability companies, and other artificial entities who receive actual notice of this Preliminary Injunction by personal service or otherwise are hereby restrained and enjoined from disbursing any funds, securities, or other property obtained from Defendant Pendergest-Holt without adequate consideration.

VII.

IT IS HEREBY ORDERED that Defendant Pendergest-Holt is hereby required to make an interim accounting, under oath, within ten days of the issuance of this order: (1) detailing all monies and other benefits which she received, directly or indirectly, as a result of the activities

alleged in the Complaint (including the date on which the monies or other benefit was received and the name, address, and telephone number of the person paying the money or providing the benefit); (2) listing all current assets wherever they may be located and by whomever they are being held (including the name and address of the holder and the amount or value of the holdings); and (3) listing all accounts with any financial or brokerage institution maintained in the name of, on behalf of, or for the benefit of, Defendant Pendergest-Holt (including the name and address of the account holder and the account number) and the amount held in each account at any point during the period from January 1, 2000 through the date of the accounting.

VIII.

IT IS HEREBY ORDERED that Defendant Pendergest-Holt and her agents, servants, employees, attorneys, and all other persons in active concert or participation with them, including any bank, securities broker-dealer, or any financial or depositary institution, who receives actual notice of this Preliminary Injunction by personal service or otherwise are hereby restrained and enjoined from destroying, removing, mutilating, altering, concealing, or disposing of, in any manner, any books and records owned by, or pertaining to, the financial transactions and assets of Defendants or any entities under their control.

IX.

IT IS HEREBY ORDERED that the Commission is authorized to serve process on, and give notice of these proceedings and the relief granted herein to, Defendants by U.S. Mail, e-mail, facsimile, or any other means authorized by the Federal Rules of Civil Procedure.

X.

IT IS HEREBY ORDERED that expedited discovery may take place consistent with the following:

*SEC v. Stanford International Bank, Ltd., et al.*                                                                                 *5*
Agreed Preliminary Injunction and Order Granting Other Relief

(1)   any party may notice and conduct depositions upon oral examination and may request and obtain production of documents or other things for inspection and copying from parties prior to the expiration of thirty days after service of a summons and the Plaintiff Commission's Complaint upon Defendants;

(2)   all parties shall comply with the provisions of Fed. R. Civ. P. 45 regarding issuance and service of subpoenas, unless the person designated to provide testimony or to produce documents and things agrees to provide the testimony or to produce the documents or things without the issuance of a subpoena or to do so at a place other than one at which testimony or production can be compelled;

(3)   any party may notice and conduct depositions upon oral examination subject to minimum notice of seventy-two (72) hours;

(4)   all parties shall produce for inspection and copying all documents and things that are requested within seventy-two (72) hours of service of a written request for those documents and things; and

(5)   all parties shall serve written responses to written interrogatories within seventy-two (72) hours after service of the interrogatories.

## XI.

IT IS HEREBY ORDERED that all parties shall serve written responses to any other party's request for discovery and the interim accountings to be provided by Defendants by delivery to the Plaintiff Commission address as follows:

> UNITED STATES SECURITIES AND EXCHANGE COMMISSION
> Fort Worth Regional Office
> Attention: David Reece
> Burnett Plaza, Suite 1900
> 801 Cherry Street, Unit #18
> Fort Worth, TX 76102-6882

*SEC v. Stanford International Bank, Ltd., et al.*                                    6
Agreed Preliminary Injunction and Order Granting Other Relief

Facsimile: (817) 978-4927

and by delivery to other parties at such address(es) as may be designated by them in writing. Such delivery shall be made by the most expeditious means available, including e-mail and facsimile.

### XII.

IT IS HEREBY ORDERED that Defendant Pendergest-Holt shall surrender her passports and is barred from traveling outside the United States until further order of this Court.

### XIII.

IT IS HEREBY ORDERED that Defendant Pendergest-Holt and her agents, servants, employees, attorneys, depositories, banks, and all other persons in active concert or participation with them who receive actual notice of this Preliminary Injunction by personal service or otherwise shall:

(1)     take such steps as are necessary to repatriate to the territory of the United States all funds and assets of investors described in the Commission's Complaint in this action which are held by them, or are under their direct or indirect control, jointly or singly, and deposit such funds into the Registry of the United States District Court, Northern District of Texas; and

(2)     provide the Commission and the Court a written description of the funds and assets so repatriated.

### XIV.

Defendants Pendergest-Holt shall have sixty (60) days from the date of this Preliminary Injunction in which to answer the Commission's Complaint.

*SEC v. Stanford International Bank, Ltd., et al.*                                                           7
Agreed Preliminary Injunction and Order Granting Other Relief

EXECUTED AND ENTERED at 4:30 o'clock ~~am~~/pm CST this 2 day of ___March___, 2009

UNITED STATES DISTRICT JUDGE

Agreed to Form:

*s/ David B. Reece*
David B. Reece
Securities and Exchange Commission
801 Cherry Street, 19th Floor
Fort Worth, Texas 76102
(817) 978-6476
(817) 978-4927 *fax*
reeced@sec.gov
*Counsel for Plaintiff Securities and Exchange Commission*


*s/ Brent R. Baker*
Brent R. Baker
Parsons Behle & Latimer
201 South Main Street
Suite 1800
Salt Lake City, Utah 84111
(801) 532-1234
(801) 536-6111 *fax*
BBaker@parsonsbehle.com
*Counsel for Defendant Laura Pendergest-Holt*